## CARNATION CO. *v.* PACIFIC WESTBOUND CONFERENCE ET AL.

No. 20.  Argued November 8, 1965.—Decided February 28, 1966.

*Arthur B. Dunne* argued the cause for petitioner. With him on the briefs was *James R. Baird, Jr.*

*Edward D. Ransom* argued the cause for respondent Pacific Westbound Conference. With him on the brief was *R. Frederic Fisher*. *Elkan Turk, Jr.,* argued the cause and filed a brief for respondents Far East Conference et al. *Daniel M. Friedman* argued the cause for the United States and the Federal Maritime Commission. On the brief were *Solicitor General Marshall, Assistant Attorney General Turner, Philip B. Heymann, Irwin A. Seibel* and *Milan C. Miskovsky.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

We granted certiorari in this case in order to determine whether the Shipping Act, 1916, 39 Stat. 728, as amended, 75 Stat. 762, 46 U. S. C. §§ 801–842 (1964 ed.), precludes the application of the antitrust laws to the shipping industry.

The petitioner in this case is a shipper in foreign commerce that ships substantial quantities of evaporated milk from the West Coast of the United States to the Philippine Islands. The respondent conferences are associations of shipping companies that establish rates for their respective members pursuant to agreements approved by the Federal Maritime Commission. Pacific Westbound Conference is composed of companies operating between the West Coast and the Far East; Far East Conference, of companies operating between the Atlantic and Gulf Coasts and the Far East.

In 1957, Pacific Westbound announced a rate increase of $2.50 per ton for the shipment of evaporated milk to the Philippine Islands. Petitioner attempted to persuade Pacific Westbound to restore the original rate, but Pacific Westbound declined to do so until 1962.

Petitioner filed an antitrust treble-damage action against the respondent conferences and their respective members shortly after the original rate was restored. Petitioner alleged that Pacific Westbound initiated and maintained the rate increase in order to implement certain rate-making agreements between the conferences which have never been approved by the Maritime Commission. Petitioner also alleges that it asked Pacific Westbound to restore the original rate and that Pacific Westbound refused to do so only because Far East would not agree to it. Petitioner claimed that it is entitled to recover treble damages because the implementation of

such unapproved agreements is unlawful *per se* under the antitrust laws.

Respondents moved to dismiss, claiming that the Shipping Act, 1916 repealed all antitrust regulation of the rate-making activities of the shipping industry. The District Court granted the motion. The Court of Appeals for the Ninth Circuit affirmed the dismissal of the action on the ground that such an action cannot be maintained until the Commission has passed upon the agreements, 336 F. 2d 650. We granted certiorari, 380 U. S. 905, and hold that the implementation of rate-making agreements which have not been approved by the Federal Maritime Commission is subject to the antitrust laws.

The Shipping Act contains an explicit provision exempting activities which are lawful under § 15 of the Act from the Sherman and Clayton Acts. This express provision covers approved agreements, which are lawful under § 15, but does not apply to the implementation of unapproved agreements, which is specifically prohibited by § 15.[1] The creation of an antitrust exemption for

---

[1] Section 15, as set forth in 46 U. S. C. § 814, provides in part:

"Any agreement and any modification or cancellation of any agreement not approved, or disapproved, by the Commission shall be unlawful, and agreements, modifications, and cancellations shall be lawful only when and as long as approved by the Commission; before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation; except that tariff rates, fares, and charges, and classifications, rules, and regulations explanatory thereof (including changes in special rates and charges covered by section 813a of this title which do not involve a change in the spread between such rates and charges and the rates and charges applicable to non-contract shippers) agreed upon by approved conferences, and changes and amendments thereto, if otherwise in accordance with law, shall be permitted to take effect without prior approval upon compliance with the publication and filing requirements of section

rate-making activities which are lawful under the Shipping Act implies that unlawful rate-making activities are not exempt. This Court so interpreted an analogous provision of the Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, 7 U. S. C. § 601 *et seq.* (1964 ed.), exempting marketing agreements approved by the Secretary of Agriculture from the antitrust laws. The Court there declared that the "explicit provisions requiring official participation and authorizations show beyond question how far Congress intended that the Agricultural Act should operate to render the Sherman Act inapplicable. If Congress had desired to grant any further immunity, Congress doubtless would have said so." *United States* v. *Borden Co.,* 308 U. S. 188, 201.

Respondents contend, nevertheless, that the § 15 exemption does not reflect the true intent of the Congress which enacted it. They insist that the structure of the Act and its legislative history demonstrate an unstated legislative purpose to free the shipping industry from the antitrust laws.

We do not believe that the remaining provisions of the Shipping Act can reasonably be construed as an implied repeal of all antitrust regulation of the shipping industry's rate-making activities. We recently said: "Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust

---

817 (b) of this title and with the provisions of any regulations the Commission may adopt.

"Every agreement, modification, or cancellation lawful under this section, or permitted under section 813a of this title, shall be excepted from the provisions of sections 1–11 and 15 of Title 15, and amendments and Acts supplementary thereto.

"Whoever violates any provision of this section or of section 813a of this title shall be liable to a penalty of not more than $1,000 for each day such violation continues, to be recovered by the United States in a civil action. . . ."

and regulatory provisions." *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 350–351. We have long recognized that the antitrust laws represent a fundamental national economic policy and have therefore concluded that we cannot lightly assume that the enactment of a special regulatory scheme for particular aspects of an industry was intended to render the more general provisions of the antitrust laws wholly inapplicable to that industry. We have, therefore, declined to construe special industry regulations as an implied repeal of the antitrust laws even when the regulatory statute did not contain an accommodation provision such as the exemption provisions of the Shipping and Agricultural Acts. See, *e. g., United States* v. *Philadelphia National Bank, supra.*

The historical background of the Shipping Act does not indicate that a different rule of construction should be applied in interpreting that Act. The Congress which enacted the Shipping Act was not hostile to antitrust regulation. On the contrary, the Shipping Act was the end product of an extensive investigation of the shipping industry that was conducted by the Congress which enacted the Clayton Act.[2]

Respondents claim, nonetheless, that the Committee which conducted the investigation must have been hostile to antitrust regulation of the shipping industry because it concluded that the abolition of the conference system, which the Sherman Act probably required, would not be in the public interest. But the Committee also concluded that the conference system had produced sub-

---

[2] The Shipping Act, 1916 was passed following an exhaustive investigation into shipping combinations undertaken by the House Committee on Merchant Marine and Fisheries under the chairmanship of Congressman Alexander. That Committee issued its Report on Steamship Agreements and Affiliations in the American Foreign and Domestic Trade, H. R. Doc. No. 805, 63d Cong., 2d Sess. ("Alexander Report") in 1914.

stantial evils and that it should not be permitted to continue without governmental supervision.

The Committee said: "While admitting their many advantages, the Committee is not disposed to recognize steamship agreements and conferences, unless the same are brought under some form of effective government supervision. To permit such agreements without government supervision would mean giving the parties thereto unrestricted right of action. Abuses exist, and the numerous complaints received by the Committee show that they must be recognized." H. R. Doc. No. 805, 63d Cong., 2d Sess., pp. 417–418.

Therefore, it seems likely that the Committee really only wanted to give the shipping industry a limited antitrust exemption. We do not believe that its purpose would be frustrated by the application of the antitrust laws to the implementation of conference agreements which have not been subjected to public scrutiny and examination by a governmental agency.[3]

But even if the Committee considered the possibility of a complete antitrust exemption at the time of the 1914 Report, the § 15 exemption clearly demonstrates

---

[3] Respondents contend that treble-damage actions will frustrate one of the Committee's purposes. The Committee found, however, that the conferences had discriminated among shippers and concluded that such discrimination should be eliminated. Respondents assert that treble-damage awards for shippers are equivalent to rebates and that shippers will receive unequal "rebates" because different courts and juries will inevitably apply different measures of damages. Therefore, they conclude that treble-damage actions will frustrate the Shipping Act policy of equality of treatment for shippers.

We believe that Congress was concerned with assuring equality of treatment by the conferences, not with equality of treatment by juries in collateral proceedings. There is no reason to believe that Congress would want to deprive all shippers of their right to treble damages merely to assure that some shippers do not obtain more generous awards than others.

that those who drafted the Shipping Act during the next Congress decided not to give the industry complete antitrust immunity. Since the problem of the application of the antitrust laws to the shipping industry was one of the focal points of the entire inquiry, the exemption provision could not have been a casual afterthought. The language of that provision must have been selected as a matter of deliberate choice in order to indicate the extent to which the industry's rate-making activities remain subject to the antitrust laws as well as the extent to which those activities are exempted from antitrust regulation.

This Court's decisions in *United States Navigation Co. v. Cunard Steamship Co.*, 284 U. S. 474, and *Far East Conference v. United States*, 342 U. S. 570, do not conflict with our interpretation of the Shipping Act. Those cases merely hold that courts must refrain from imposing antitrust sanctions for activities of debatable legality under the Shipping Act in order to avoid the possibility of conflict between the courts and the Commission.

The plaintiffs in the *Cunard* and *Far East* cases were seeking to enjoin activities which allegedly implemented unapproved agreements even though the Commission had never determined whether those alleged activities constituted the implementation of unapproved agreements. There was a real risk that the District Court might find that the defendants had implemented unapproved agreements while the Commission might find in some later proceeding that the same activities constituted the implementation of approved agreements. This Court decided that the danger of such a conflict could best be avoided by holding that one tribunal or the other has the exclusive right to make the initial factual determination. Since the Commission has specialized knowledge of the industry, the Court concluded that such primary jurisdiction should be vested in the Commission

and accordingly instructed the District Court to refrain from acting until the Commission had ascertained and interpreted the circumstances underlying the legal issues.

The relief requested in the *Cunard* and *Far East* cases also created another source of possible conflict. Even if the Commission found that the defendants in those cases had implemented unapproved agreements, the Commission might decide to approve the prospective implementation of those agreements. The Commission would obviously be hampered in the exercise of that power if a court had previously issued an unconditional injunction prohibiting the implementation of the agreements in question. Therefore, the Court concluded that the District Court should not be permitted to issue an unconditional injunction in the absence of a Commission determination disapproving future operations under those agreements.

The considerations which led to our decisions in the *Far East* and *Cunard* cases do not require that the shipping industry be totally immunized from antitrust regulation. The *Far East* and *Cunard* principles permit courts to subject activities which are clearly unlawful under the Shipping Act to antitrust sanctions so long as the courts refrain from taking action which might interfere with the Commission's exercise of its lawful powers. The *Far East* opinion explicitly recognized that this is the case. The Court observed that the Government could reinstate its injunction suit if and when the Commission found that the defendants' activities were not lawful under the Shipping Act and would not be approved prospectively.[4]

---

[4] The Court said:

"Having concluded that initial submission to the Federal Maritime Board is required, we may either order the case retained on the District Court docket pending the Board's action . . . or order dismissal of the proceeding brought in the District Court. . . . We

The award of treble damages for past and completed conduct which clearly violated the Shipping Act would certainly not interfere with any future action of the Commission. Although the Commission can approve prospective operations under agreements which have been implemented without approval, respondents concede that the Commission has no power to validate preapproval implementation of such agreements. Therefore, the *Far East* and *Cunard* principles only preclude courts from awarding treble damages when the defendants' conduct is arguably lawful under the Shipping Act.

The Court of Appeals thought that respondents' activities were arguably lawful under the Shipping Act. It concluded that respondents' activities conceivably constituted the implementation of a 1952 agreement between the respondents which had been approved by the Commission. Therefore, the Court of Appeals affirmed the District Court's order dismissing the action.

We believe that the Court of Appeals erred in dismissing the action. The Court of Appeals apparently thought that this was the proper course because this Court dismissed the action in *Far East*. However, the *Far East* opinion indicates that the Court only chose to dismiss that action rather than to stay the proceedings pending Commission action because it found that dismissal would not prejudice the plaintiff's right to obtain

---

believe that no purpose will here be served to hold the present action in abeyance in the District Court while the proceeding before the Board and subsequent judicial review or enforcement of its order are being pursued. A similar suit is easily initiated later, if appropriate." 342 U. S. 570, 576–577.

If the *Far East* decision had held that the activities in question could never be subjected to the antitrust laws under any circumstances, there would obviously have been no reason to consider whether the proceedings should be stayed or dismissed. Thus, the *Far East* opinion effectively determined that the implementation of unapproved rate-making agreements is subject to antitrust regulation.

antitrust relief at the appropriate time.[5] That plaintiff was seeking injunctive relief from continuing conduct. Such a suit could easily be reinstituted if and when the Commission determined that the activities in question violated the Shipping Act. But a treble-damage action for past conduct cannot be easily reinstituted at a later time. Such claims are subject to the Statute of Limitations and are likely to be barred by the time the Commission acts. Therefore, we believe that the Court of Appeals should have stayed the action instead of dismissing it.

The Commission completed its own investigation of respondents' activities after certiorari was granted and concluded that its approval of respondents' 1952 agreement did not cover the implementation of the subsequent agreements which are the basis of petitioner's treble-damage complaint.[6] An appeal from the Commission's decision is now pending.

Petitioner's treble-damage action is based upon the theory that those same subsequent rate-making agreements are unlawful *per se* under the antitrust laws.

---

[5] See note 4, *supra.*

[6] The Federal Maritime Commission commenced an investigation in 1959 to determine whether the 1952 agreement between respondents constituted the full agreement between the parties. This investigation culminated in the issuance of the Commission's Report on *Joint Agreement Between Member Lines of the Far East Conference and the Member Lines of the Pacific Westbound Conference,* Federal Maritime Commission Docket No. 872, July 28, 1965, rehearing denied, November 1, 1965.

The Commission found that the respondents had entered into and implemented a number of joint rate-making agreements after the Commission approved the 1952 agreement for consultation and that none of the subsequent agreements had been filed for approval. The Commission concluded that its approval of the 1952 agreement did not cover any of the subsequent agreements and, therefore, that respondents had violated the Shipping Act by implementing those subsequent agreements.

Petitioner participated in the proceedings before the Commission, but petitioner did not ask for reparations under the Shipping Act and, therefore, could not be accorded any. Petitioner's failure to seek Shipping Act reparations does not affect its rights under the antitrust laws. The rights which petitioner claims under the antitrust laws are entirely collateral to those which petitioner might have sought under the Shipping Act. This does not suggest that petitioner might have sought recovery under both, but petitioner did have its choice.

Therefore, we reverse the order dismissing this action and remand the case to the United States District Court for the Northern District of California with instructions to stay the action pending the final outcome of the Shipping Act proceedings and then to proceed in a manner consistent with this opinion.

*It is so ordered.*