389 F.2d 962
 129 U.S.App.D.C. 1
 AMERICAN EXPORT-ISBRANDTSEN LINES, INC., et al., Petitioners,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents, Empire State Highway Transportation
Association, Inc., Middle Atlantic Conference(MAC), Harbor
Carriers of the Port of New York, James Hughes, Inc., Henry
Gillen's Sons Lighterage Line, Inc., McAllister Lighterage
Line, Inc., and Petterson Lighterage & Towing Corporation,
Intervenors.
 No. 20286.
 United States Court of Appeals District of Columbia Circuit.
 Argued Sept. 11, 1967.
Decided Jan. 18, 1968.
 
 Mr. Mark P. Schlefer, Washington, D.C., with whom Mr. Stuart C. Law, Washington, D.C., was on the brief, for petitioners.
 Mr. Joseph F. Kelly, Jr., Attorney, Federal Maritime Commission, with whom Asst. Atty. Gen. Donald F. Turner and Messrs. James L. Pimper, General Counsel, Federal Maritime Commission, Robert N. Katz, Solicitor, Federal Maritime Commission, Walter H. Mayo III, Attorney, Federal Maritime Commission, at the time the brief was filed, and Irwin A. Seibel, Attorney, Department of Justice, were on the brief, for respondents.
 Mr. Herbert Burstein, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. Joseph Rotwein, Washington, D.C., was on the brief, for intervenor Empire State Highway Transportation Association, Inc.
 Mr. Christopher E. Heckman, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. L. Agnew Myers, Jr., Washington, D.C., was on the brief, for intervenor Harbor Carriers of the Port of New York and certain other intervenors.
 Mr. Thomas M. Knebel, Washington, D.C., was on the brief for intervenor Middle Atlantic Conference.
 Before DANAHER, BURGER and WRIGHT, Circuit Judges.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 This case is before the court on a petition to review an order of the Federal Maritime Commission issued and served on May 16, 1966, pursuant to the Shipping Act of 1916, 39 STAT. 728 (1916), as amended, 46 U.S.C. 801 et seq. (1964). The order deals with certain provisions of the truck and lighterage tariffs filed by the petitioners here, the New York Terminal Conference, and grows out of the New York waterfront investigation ordered by the Commission in October 1963. The purpose of the investigation was to determine whether the rates, rules, regulations and practices contained in petitioners' Lighter Tariff No. 2 and Truck Tariff No. 6 violated Sections 15, 16 and 17 of the Shipping Act.[1]
 
 
 2
 A full and lenghty hearing was conducted at which petitioners and various intervenors were permitted to introduce evidence, cross-examine witnesses and present oral argument. The hearing examiner filed an extensive initial decision and exceptions were taken. On May 16, 1966, the Commission issued its report and order, which generally adopted the findings and recommendations of the examiner. The Commission found that several of petitioners' practices were in violation of the Act and ordered petitioners to modify certain provisions of their tariffs so as to comply with the requirements of the Act. Petitioners object on several grounds to virtually every segment of the Commission's order. Before assessing the order and the objections thereto, it is necessary to summarize briefly the workings of the New York waterfront and the role which petitioners perform there as terminal operators.
 
 
 3
 Petitioners are companies which operate maritime terminals in New York Harbor. They are associated in the New York Terminal Conference and operate under a Conference Agreement[2] which permits them to establish uniform reasonable rates and regulations covering loading, unloading and storage of waterborne cargo.[3] With respect to oceangoing cargo, these terminal operators enter into negotiated stevedoring contracts with steamship companies, under which the terminal's employees load and unload the vessels.[4] At least 85 per cent of this cargo is brought to and from the wharf or pier by truck, while the small and diminishing remainder is handled by lighters[5] and barges which transfer the cargo between the pier (or ship) and some other point in the harbor.
 
 
 4
 When a trucker arrives at the pier he must check in with a clerk employed by the terminal operator. Once his papers are processed he receives a gate pass and takes his place in line. Though all truck loading must be done by the terminal operators, the trucker has an option either to unload his truck himself or, for an additional charge, to have the terminal operator perform or assist in the unloading. But the so-called 'three o'clock rule' of petitioners' truck tariff assures the same-day services of forklift operators and checkers, who must be terminal employees, at straight-time rates only if the unloading is done exclusively by terminal employees. No matter who does the initial unloading, the cargo is then moved by hilo or forklift from the base of the truck to a place of rest on the pier or, occasionally, directly to the hold of the ship. These forklift operators, as well as the checker who inventories the cargo, must be employees of the terminal operators. Though the piers are under their direct authority and control, the operators in Item 16 of Truck Tariff No. 6 disclaim all liability for truck delays, whatever their cause.[6]
 
 
 5
 Lighter loading and unloading is also done in one of two ways-- 'over the side' or 'to the pier.' When the lighter is unloaded 'to the pier,' it is moored alongside the pier and, using the rigging on the lighter or a crane on the pier, the cargo is transferred from the lighter to the pier. From there the cargo is usually moved to a less congested area for later transfer to the ship. Virtually all 'to the pier' operations are performed by the Wm. Spencer Stevedoring Company, whose longshoremen, known as 'Chenangos,' compose a separate local of the International Longshoremen's Association. The lightermen pay Spencer for unloading the lighter at a negotiated contract rate. When Spencer labor is unavailable, the terminal operators provide the necessary labor for 'to the pier' work, also at a negotiated rate.
 
 
 6
 When a lighter is loaded (or unloaded) 'over the side,' it is moored along the non-pier side of the oceangoing vessel and the cargo is transferred directly from the hold of the ship to the deck of the lighter (or vice versa), usually with the use of the ship's rigging. This work is always performed by longshoremen employed by the terminal operator in its stevedoring capacity. When the lighter is loaded or unloaded alongside the ship, the lighterman is required under the tariff to pay the terminal operator for the services of its men. Since the cargo need not be transferred either to or from the pier, this procedure avoids one step in the process of getting cargo on or off the ship. The method by which a lighter will be worked and when it will be worked are entirely within the control of the terminal operator who has, by contract, assumed the stevedoring function for the ship. Yet there is no provision in the lighterage tariff for compensation to lightermen for delays within the terminal operator's control.
 
 
 7
 It is primarily with the foregoing practices that the Commission's investigation and order are concerned.
 
 
 8
 (1) The truck detention rule.
 
 
 9
 Much of the testimony before Hearing Examiner Jordan concerned the congestion and excessive delays experienced by truckers waiting to load and unload their trucks at the piers. Petitioners do not take issue with the Commission's amply supported finding that the problem of truck delay is a very serious one,[7] and they agree that what can reasonably be done should be done to facilitate and expedite the exchange of cargo between trucks and ocean carriers at piers in New York Harbor. Nor do they take issue with the Commission's finding that there are increased operating costs resulting from this inefficient use of equipment and labor which affect the truckers' ability to compete with other modes of transportation.[8]
 
 
 10
 The examiner, after hearing several witnesses testify of inordinate delays, concluded that the 'truckmen have a right to expect handling as expeditiously as possible, and they have a right to get better handling than they have had in many specific cases.' He found that the terminal operators' failure to include a reasonable detention rule in their truck tariff violated Section 17 of the Shipping Act,[9] and ordered them to frame such a rule. However, because delays frequently occur which are not the fault of petitioners, the examiner allowed that the rule should 'acknowledge causation and exonerate the terminal for delays which it cannot control.'
 
 
 11
 The Commission adopted the examiner's findings and conclusions.[10] It agreed that the disclaimer of all liability for truck detention in Item 16 of the terminal operators' Truck Tariff No. 6 was a violation of Section 17. While conceding the difficulty the terminal operators might face in drafting a truck detention rule, it affirmed the examiner's order that Item 16 be deleted from the tariff and that a reasonable detention rule which would compensate truckers 'for unusual truck delays caused by or under the control of the terminals' be inserted.
 
 
 12
 Petitioners contend that the Commission's order is arbitrary because inconsistent with its findings. They argue that the order requiring them to frame a rule of liability for truck delays is inconsistent with the finding that 'it is virtually impossible to determine responsibility for truck delay because of the many and varied factors which may or do contribute toward a particular instance of delay.' But the Commission also found that '* * * most of the delays are within the control of (petitioners).' It has not told the terminal operators that to free themselves of liability they must prove what the cause of the delay was and that the delay was beyond their control. The Commission may well be satisfied with a rule exonerating the operators upon a showing that they are free from fault. Certainly it is eminently reasonable that the operators should be liable for unusual delays within their control, and essentially the Commission has simply ordered that they frame a rule making them liable for such delays. Otherwise stated, the Commission thus accorded to the operators an opportunity in the first instance to evolve a workable plan to dissipate the adverse aspects of the present plan.
 
 
 13
 Petitioners go on to argue that the Commission arbitrarily rejected their 'proposed solution'-- the truck appointment system which is developed in Truck Tariff No. 7.[11] By this system a truck intending to deliver or pick up cargo at a pier would first make an appointment and, if it appeared on schedule, would presumably be serviced promptly. But the Commission certainly did not 'reject' this proposal. Rather it pointed out that it looked with favor on attempts to work out such a system and hoped that it would alleviate many of the problems growing out of congestion on the piers. It concluded, however, that the system, even if workable, did not obviate the need for a truck detention rule. For while the proposed system might reduce delays, it will not tell truckers what redress they can expect when culpable delays nevertheless occur. Of course if the appointment system proves practicable, then presumably delays resulting from the truckers' failure to make appointments would not be within the control of the terminal operators and thus would not be compensable.
 
 
 14
 Petitioners also contend that the order cannot be understood and is void for vagueness and ambiguity. They point out that the order leaves unanswered such questions as: What will be the measure of damages and what sort of tribunal will fix them? What is an unusual delay? Who shall have the burden of proof of causation? And what does 'under the control of the terminal' mean?
 
 
 15
 Despite these questions, we perceive no legitimate basis for complaint about the order's indefiniteness. Rather petitioners should welcome the leeway and flexibility the Commission has given them in framing a truck detention rule. Any vagueness in the Commission's order should make compliance with it that much easier. The Commission has simply given petitioners, who control and are most familiar with the conditions on the piers, broad initial authority to construct a rule and an enforcement procedure which is fair to all the parties concerned. It hardly behooves them to complain that they have been left too many options in undertaking this task. Any indefiniteness complaint petitioners or their Conference may have against the order is certainly premature pending a good faith effort on their part to comply with it.[12] Certainly the Commission may even compel parties under its jurisdiction to design their own method of overcoming violations of the Act it administers. State of California v. United States, 320 U.S. 577, 583, 64 S.Ct. 352, 88 L.Ed. 322 (1944); Imposition of Surcharge on Cargo to Manila, Republic of the Philippines, 8 F.M.C. 395, 402 (1965). See also States Marine Lines, Inc. v. Federal Maritime Com'n, 126 U.S.App.D.C. 187, 376 F.2d 230 (1967).
 
 
 16
 Nor is there any merit in petitioners' argument that the Commission's order exceeds its statutory authority under Section 17 of the Shipping Act to 'enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property.' Petitioners' theory is that, since the truck has a fixed tariff rate for carriage of cargo irrespective of delay, any compensation for truck detention will enure to the truckers, not to the cargo. Thus any detention rule would simply provide for a settlement of accounts between transportation agencies and is not a practice or regulation relating to the '* * * delivering of property.'
 
 
 17
 But this argument misses the point. For though the truckers cannot collect from the particular shipper for each delay associated with transporting its cargo,[13] the inefficient utilization of trucking facilities results in increased operating costs which are passed on to all shippers and receivers of export and import traffic in the form of generally higher tariff rates.[14] Imposing liability for truck detention on the terminal operators will create an incentive for them to take whatever steps they can to reduce the congestion and the costly, wasteful delays which now characterize pier operations on the New York waterfront. Savings from efficiencies will presumably be passed on to shippers and receivers and, ultimately, will accrue to consumers. Obviously the order of the Commission bears directly on a practice or rule relating to the handling of cargo and is clearly within its statutory authority.
 
 
 18
 Finally, petitioners argue that the truck detention order constitutes an exercise of the Commission's rule-making authority and that the Commission failed to comply with the rule-making procedures required by the Administrative Procedure Act-- particularly Section 4, 5 U.S.C. 553 (Supp. II 1965-66) (formerly 5 U.S.C. 1003 (1964 ed.)), which requires that notice of a proposed rule be published in the Federal Register or served personally on all interested parties.
 
 
 19
 The line between rule-making and adjudication is, of course, an uncertain one, and it is difficult-- in some cases meaningless-- to try to characterize particular administrative action as one or the other. It simply will not fit precisely in either mold. See Shapiro, The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 HARV.L.REV. 921, 924-925 (1965). Here, however, we think the Commission's action was essentially adjudicatory. It prescribed no specific rule-- in fact this is one of petitioners' complaints. It merely held that the petitioners' failure to prescribe one violated the Shipping Act, and ordered them to remedy this violation. See Philadelphia Co. v. Securities and Exchange Com'n, 84 U.S.App.D.C. 73, 175 F.2d 808 (1948). Petitioners were advised of the nature and purpose of the proceedings in the notice of investigation and were permitted full participation in it. In these circumstances we do not find a violation of the Administrative Procedure Act.
 
 
 20
 (2) The three o'clock rule.
 
 
 21
 The Commission found that Item 10 of petitioners' Truck Tariff No. 6, the so-called 'three o'clock rule,'[15] was an unjust and unreasonable practice under Section 17 of the Shipping Act. This rule provides that a truck which has been checked in with the receiving or delivery clerk and is in line and ready to receive or discharge cargo by 3:00 P.M. 'is entitled to be serviced until completion at the straight-time tariff rates.' However, the rule's next sentence exempts from this guarantee of straight-time rates those truckers who unload without the services of the terminal operator.
 
 
 22
 The terminal operators maintain that this portion of the rule is necessary because unless their employees are used they cannot control the speed of unloading operations, and a slow unloader will unduly tie up the terminal operator's checker and forklift operator, who must be available to remove the unloaded cargo no matter who does the initial unloading.
 
 
 23
 The Commission rejected this contention. It viewed the three o'clock rule as objectionable unless its coverage were extended to cases where the trucker unloads his own truck. It found-- and there is evidence in the record to support its findings-- that the rule effectively compels truckers to use the unloading services of the terminal operators for a fee and renders illusory the option nominally available to the trucker to unload his own truck. So long as there is substantial evidence in the record to support its conclusions,[16] a finding such as this one is clearly within the competence of the Commission, and the court will not seek to substitute its judgment.
 
 
 24
 Petitioners also argue that the Commission's order is arbitrary in that it fails to give adequate consideration to the impact of petitioners' proposed appointment system on the operation of the new three o'clock rule contained in Truck Tariff No. 7. Under this tariff the rule is limited to trucks arriving without appointment. Petitioners argue that, if the Commission's order is held to apply to the new rule, it will undermine the entire appointment system. They read the order as requiring them to service at straight-time rates all trucks that appear before 3:00 P.M. even if the appointment system is in operation and no appointment was made.
 
 
 25
 But the Commission did not pass on the validity of the three o'clock rule in Tariff No. 7, for this tariff was not within the scope of its investigation. The Commission simply found that the rule as contained in Tariff No. 6 discriminated unjustifiably against truckers seeking to unload their own trucks. If the new rule does not so discriminate, then it is presumably valid. Nowhere in the Commission's report or order is there any intimation that if a workable appointment system is devised the operators cannot discriminate between those truckers who arrive with an appointment and those who do not.
 
 
 26
 (3) The lighter detention rule.
 
 
 27
 In the terminal operators' Lighter Tariff No. 2 there is no provision assuring compensation to lightermen for delays, though the tariff, unlike the truck tariff, does provide that nothing therein shall preclude lighters from asserting detention claims against steamships. The Commission found-- and the evidence supports its finding-- that the record indicated many instances of lighter detention which could be attributed to the terminal operators, for the operators determine in what manner and with what priority a certain lighter will be loaded or unloaded. These delays tie up men and equipment and result in added costs to the lighterage companies.[17] The Commission concluded that petitioners' failure to include a just and reasonable lighter detention rule was a violation of Section 17 of the Shipping Act, and it ordered the terminal operators to frame such a rule.
 
 
 28
 The terminal operators object that there is insufficient evidence in the record to indicate that collection from steamship companies has proved unsatisfactory, and that there is no adequate reason why they should be forced to serve as a collection agency for the lightermen. But petitioners' objection misconceives the thrust of the Commission's findings and order. The Commission did not conclude that the terminal operators should be liable for lighter detention because it found that collection from steamship companies had been unavailing; rather, it fixed liability on the terminal operators themselves because it found that most delays were within their control and thus concluded that they should bear the added expense of such delays. By assuming the ocean carriers' traditional obligation of loading and unloading, petitioners also must assume responsibility for insuring that just and reasonable rules govern performance of this task. The Commission reasoned that where the stevedoring function is assumed by the terminal operator, it should not escape liability for delays within its control.
 
 
 29
 Here, just as with respect to a truck detention rule, the Commission did not direct petitioners to include a specifically worded provision in their tariff. It directed only that a provision be included which places liability on the terminal operators where delays are within their control. If the delays are due to weather conditions, the actions of the shipper or steamship company, or any other causes beyond the control of the terminal operators, there will be no obligation on the terminal operators to pay detention. Moreover, petitioners' objections, like their objections to constructing a truck detention rule, are premature. Before they can legitimately complain they should make a good faith effort to construct the required provision and include it in their lighter tariff. Then if the Commission decides it is not a just or reasonable one, its decision may be reviewed in another proceeding.
 
 
 30
 The Commission also found that the terminal operators' tariff provisions on the issue of detention claims against shippers gave an unreasonable preference to lighter traffic over truck traffic. Petitioners' truck tariff states that no claim for delay will be honored, while the lighter tariff makes clear that nothing therein affects the lighterage companies' rights against the steamship companies.[18] The Commission ordered that the truck tariff be made to conform with the lighter tariff on this point.
 
 
 31
 Petitioners claim that the Commission has decreed the impossible by ordering them to conform their truck tariff to a lighter tariff which has itself been found to violate Section 17. But clearly the Commission's orders are not contradictory. Petitioners have not been told that the permissive rule as to collection from steamship companies in the lighter tariff must be altered, but only that it must be supplemented. While it is true that the situations where a trucker can make a legitimate claim for detention from a steamship company may be infrequent, this fact at worst makes the Commission's order on this point trivial, not unsupported or unauthorized'
 
 
 32
 (4) Petitioners' 'to the pier' operations.
 
 
 33
 The vast bulk of lighter-pier work is performed on a negotiated rate basis by the Wm. Spencer Company, which is not a terminal operator but a stevedoring company specializing in handling lighter freight. Occasionally, however-- when Spencer labor is unavailable-- 'to the pier' services are provided by the terminal operators. The Commission ordered that petitioners publish a rate tariff which would apply to these services to the extent petitioners perform them and would inform potential recipients of the services of the precise charges to be expected. The Commission, relying on one of its earlier decisions, Empire State Highway Transportation Ass'n v. American Export Lines, 5 F.M.B. 565, 590 (1959), concluded that negotiated rates, unlike a clear and precise tariff rate, do not give adequate advance notice to prospective users, and are not uniform for all users similarly situated.
 
 
 34
 Petitioners complain that the order is unlawful because, contrary to prior Commission decisions, it requires them to publish a tariff which would not set forth clearly the conditions of its application. They argue that the Commission has not ordered them to perform 'to the pier' stevedoring at all and that a tariff applicable only 'when such services are performed' is unlawfully indefinite, citing Empire State Highway Transportation Ass'n v. American Export Lines, supra. Petitioners admit that, given the report and the record, it is clear that what is contemplated by the Commission is a tariff requiring petitioners to undertake to furnish 'to the pier' services at a fixed rate when Spencer Company labor is unavailable and the terminal operator itself can spare its men. But petitioners urge that even this sort of condition is unlawfully indefinite, first because Spencer's availability varies with the price the lightermen are willing to pay it, which in turn depends in part on the terminal operator's tariff rate, and second because whether the terminal operator can spare labor is a subjective concept which cannot be cast in objective terms.[19]
 
 
 35
 Petitioners' first objection is purely speculative. There is no evidence that the terminal operators' negotiated contracts with the lightermen when Spencer labor is unavailable have resulted in a discernible trend away from use of Spencer labor. Since petitioners' tariff rate for such services will be compensatory and need not be competitive with Spencer's, there is no reason to expect a change in Spencer's share of 'to the pier' operations. As to petitioners' second objection, while 'availability of labor' may be a subjective concept, since the Commission has left it for petitioners to gauge, their objection is an unseemly one. They cannot legitimately complain that the Commission did not go further than it did by ordering petitioners to stevedore 'to the pier' whenever such services are requested.
 
 
 36
 Petitioners also contend that the order is invalid because it creates a patent and glaring discrimination by compelling the pier operators to publish a tariff for stevedoring lighters when Spencer, for the same services, is allowed to continue to charge any price it can negotiate. It is, they maintain, arbitrary and an abuse of discretion to require a tariff of the stevedore who 'rarely' performs a service while leaving the one who 'usually' performs it free to do business at secret, negotiated, rates.
 
 
 37
 There is nothing, however, which requires the legislature or an administrative agency to confront and remedy all similar problems in one proceeding. It is not necessary that 'all evils of the same genus be eradicated or none at all.' Railway Express Agency v. People of State of New York, 336 U.S. 106, 110, 69 S.Ct. 463, 466, 93 L.Ed. 533 (1949). Here the Commission's investigation, report and order dealt only with the terminal operators' truck and lighter tariffs, and not with the practices of stevedoring companies generally. We would expect, however, that if the Commission has jurisdiction over Spencer Company it would initiate an investigation to determine if Spencer's current practices should be permitted to continue.
 
 
 38
 (5) Charges for 'over the side' stevedoring.
 
 
 39
 Petitioners' Lighterage Tariff No. 2 provides for a payment to be made by the lighterman to petitioners when cargo is transferred directly between the hold of the ship and a lighter moored alongside. This stevedoring is performed by the terminal operator's employees, and the charge is presumably for the use of its labor. The Commissioner in effect ruled that any charge to lightermen for this service, no matter what the amount, violated the Shipping Act,[20] and ordered petitioners to strike the provision from their tariff.
 
 
 40
 Despite some indications to the contrary, there was certainly substantial evidence in the record to support the Commission's finding that the terminal operators' expenses in stevedoring directly to a lighter are no greater than those involved where the comparable work is performed to the pier.[21] Yet when stevedoring is done to or from the pier, the terminal operators charge neither truckers nor lightermen, but only the steamship company to whom they have assumed the contractual obligation of loading and unloading.[22] And the charges which petitioners impose on the carrier for fulfilling this obligation are the same whether the work is performed to the pier or over the side. Consequently, since the terminal operators' expenses are also the same, they are in effect paid twice for the same work-- once by the carrier and once by the lighterman-- when stevedoring is performed over the side. This results in a double charge on the cargo[23] and in double compensation to the terminal operator. This bonus is obtainable simply because 'over the side' stevedoring, by eliminating one step in the loading or unloading process is more efficient than comparable work performed 'to the pier.'
 
 
 41
 It is impossible to say that the industry of the terminal operators, the carriers, or the lightermen is responsible for this added efficiency; consequently no particular party can be said to have earned the increment which derives from it. Certainly the terminal operators cannot reasonably claim they are in any sense entitled to double compensation for over the side stevedoring. Thus they are reduced simply to objecting that the Commission's order transfers a windfall.[24] But in a situation like this one, the allocation of benefits should be fixed with a view toward assuring they will ultimately be passed on to the consumer and toward equalizing the competitive positions of the various participants in the waterfront operations. These are matters which are peculiarly within the competence and expertise of the Commission. Certainly the Commission could reasonably conclude that by eliminating the charge to lightermen the rates charged by them to the shipper would be reduced commensurately. It could also reasonably conclude that, since the efficiency of over the side operations is associated only with lightering, the benefits of those efficiencies should accrue only to those shippers employing lighter services.[25]
 
 
 42
 (6) Alleged violations of the Administrative Procedure Act.
 
 
 43
 Finally petitioners maintain that the whole of the Commission's order is void because the proceedings of which it is the culmination were vitiated by violations of the Administrative Procedure Act strictures against commingling of functions. Petitioners charge that the Commission's internal structure violates Section 5(c) in that it places hearing examiners under the 'supervision of direction' of staff members having investigatory responsibility.[26] They allege that another portion of Section 5(c) was violated in this particular case in that, first, staff members engaged in investigation were present when the Commission voted its report and order and, second, an ex parte communication was made to the Commission by a member of the staff.[27] Though the Commission's procedures could have been improved in several particulars-- and we are advised in brief and argument that the lines of authority within the agency have now been demarcated with more precision-- we find, on the facts of this case, no actual violations of the Administrative Procedure Act which would invalidate the Commission's order, or even sufficient evidence of such violations to warrant a full evidentiary hearing.
 
 
 44
 Affirmed.
 
 
 
 [1]
 The order, 9 F.M.C. 505 (1966), Commission Docket No. 1153, is entitled 'Truck and Lighter Loading and Unloading Practices at New York Harbor.' No Section 15 (46 U.S.C. 814) violations are at issue here. Sections 16 (46 U.S.C. 815) and 17 (46 U.S.C. 816) are reproduced in relevant part at Notes 18 and 9 infra
 
 
 [2]
 Conference Agreement, F.M.C. No. 8005
 
 
 [3]
 In return for comprehensive regulation by the F.M.C., the Conference Agreement, if approved by the Commission, is given exemption from the antitrust laws. Section 15 of the Shipping Act, 46 U.S.C. 814. See also Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709, 851 (1966)
 
 
 [4]
 In many instances the terminal operator is simply an arm of a steamship company owning and operating its own piers
 
 
 [5]
 The lighters involved in this case are non-self-propelled vessels about 115 feet long and 35 to 40 feet wide. They carry their cargo on an open deck which is about 87 feet by 32 feet
 
 
 [6]
 Item 16 of Truck Tariff No. 6 provides: 'The Terminal Operator assumes no responsibility for delay to motor vehicles and no claims for such delay will be honored.'
 
 
 [7]
 The Commission found that:
 'The record shows that there is congestion and excessive delay in truck loading at the piers, that normal delays run from 1 to several hours, and that the trucks begin arriving at the piers more than one hour before they open in order to offset the delay they will experience. * * *
 'Delay is perhaps the greatest single problem involving truck traffic. * * *' 9 F.M.C. at 509.
 
 
 [8]
 The Commission also found that:
 '* * * Witness after witness testified to the inconvenience and expense to motor carriers resulting from the chronic delay of vehicles at the piers. These delays are a serious problem to the motor carriers because the inefficient use of equipment and labor tend to increase operating costs, thus affecting their ability to compete with other modes of transportation. They are problems to shippers and receivers because the increased costs are necessarily passed on to them in the form of higher rates.' Ibid.
 
 
 [9]
 Section 17, 46 U.S.C. 816, in pertinent part, provides:
 'Every such carrier and every other person subject to this chapter shall establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property. Whenever the Board finds that any such regulation or practice is unjust or unreasonable it may determine, prescribe, and order enforced a just and reasonable regulation or practice.'
 
 
 [10]
 Petitioners maintain that the order with respect to truck detention is arbitrary in that it fails to give findings and reasons as required by Section 8(c) of the Administrative Procedure Act, 5 U.S.C. 557(c) (Supp. II 1965-66) (formerly 5 U.S.C. 1007(b) (1964 ed.)). But clearly there was in the record before the Commission 'such relevant evidence as a reasonable mind might accept as adequate to support (its) conclusion.' Consolidated Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). This is all that is required by Section 10(e) of the Administrative Procedure Act, 5 U.S.C. 706 (Supp. II 1965-66) (formerly 5 U.S.C. 1009(e) (1964 ed.)). Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 483, 490, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The Commission's findings themselves provide more than adequate reason for the rule. See Notes 7 and 8, supra
 
 
 [11]
 Petitioners' proposed Truck Tariff No. 7, which would supersede the tariff under investigation, had been filed with the Commission by the time it issued its report and order. While the Commission, in its brief before this court, does rely on the fact that petitioners have proposed an appointment system as evidence for its claim that 'petitioners themselves recognize that because of their control of the terminals, they are in a position to prevent delays,' the investigation itself was limited to those regulations and practices contained in Truck Tariff No. 6. Its rulings, however, to the extent they are relevant to the practices outlined in Tariff No. 7, presumably apply to that tariff as well
 
 
 [12]
 By this we do not mean to say that rather than challenge the Commission's order petitioners should simply have sat back and done nothing, as the petitioners did in Outward Continental North Pacific Freight Conference v. F.M.C., 128 U.S. App.D.C.-- , 385 F.2d 981 (1967), waiting to object to the orders themselves until the Board Affirmatively sought compliance. Here, however, the Commission has ordered petitioners to frame and enforce their own rule, and any difficulties which they may encounter in trying to do so cannot be reasonably appraised until a good faith attempt at compliance is made
 
 
 [13]
 Petitioners point to the Interstate Commerce Commission's report and order in Detention of Motor Vehicles-- Middle Atlantic and New England Territory, 318 I.C.C. 593 (1962), to support this contention. But as intervenor Middle Atlantic Conference (MAC)-- an I.C.C. certified conference of truckers-- points out, the I.C.C. reopened its investigation and in its revised report and order, 325 I.C.C. 336 (1965), refused, despite the terminal operators' objection, to restrict MAC's detention rule to exclude its applicability to detention of vehicles at New York piers. The I.C.C. concluded that 'efficient and economical operation of vehicles is the objective no less when the interchange is of waterborne traffic as when it is of other traffic.' 325 I.C.C. at 340
 
 
 [14]
 MAC's rule does not designate who should be liable for truck detention. Because of the terminal operators' disclaimer of liability in Truck Tariff No. 6, which immunizes the steamship companies and others operating piers at New York Harbor, the truckers' only recourse has been to try to collect the charges from the shipper who has entered the contract of transportation with the motor carriers. But since the shipper is in no way responsible for delay at the piers, the shippers refuse to pay such charges. Consequently, the costs of delays are reflected in generally higher rates and charges for motor carrier service
 
 
 [15]
 Item 10 of Truck Tariff No. 6 provides:
 'A truck in line to receive or discharge cargo by 3 P.M. and which has been checked in with the Receiving Clerk or Delivery Clerk, as the case may be, and is in all respects ready to be loaded or unloaded, is entitled to be serviced until completion at the straight-time tariff rates. This rule shall not apply to trucks unloaded without the services of the terminal operator.'
 
 
 [16]
 Joseph Adelizzi, managing director of the Empire State Highway Association, an organization of truckers, testified that 'if we are not using (the terminal operator's) services (in unloading), then he is not interested in the operation.' He explained that where the trucker, even when arriving before 3:00 P.M., unloaded his own truck, the terminal operator would delay in assigning him a checker and a hilo operator
 
 
 [17]
 When the lighter is worked over the side, delays are particularly frequent. Sometimes lighters are detained a matter of days, in which case the lightermen may incur additional wharfage charges payable to the terminal operator
 
 
 [18]
 This was found to violate Section 16 of the Shipping Act which, in pertinent part, provides:
 'It shall be unlawful for any common carrier by water, or other person subject to this chapter, either alone or in conjunction with any other person, directly or indirectly--
 'First. To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disdavantage in any respect whatsoever * * *.' 46 U.S.C. 815.
 
 
 [19]
 Petitioners also contend that a portwide strike will ensue if they are required to publish a tariff rate for to the pier services and thereby compete with the Spencer Company, whose employees are not members of the local with which the terminals have an exclusive bargaining contract. Petitioners take the Commission to task for not considering these alleged consequences of its order
 But the terminal operators did not even bother to raise the spectre of a strike before the Commission in their exceptions to the hearing examiner's decision. Moreover, as the Commission said in considering Spencer's exceptions to the examiner's decision, Spencer's position cannot relieve the terminal operators of their obligations under the Shipping Act.
 
 
 [20]
 The hearing examiner found that the charge to lightermen was not authorized by the Conference Agreement because the Agreement refers only to the imposition of rates for services 'on the pier.' Article 1, Agreement 8005. He also found that because direct transfer service is entirely a stevedoring function, paid for by the vessel, the imposition of another charge on the lighter for the same service was an unjust and unreasonable practice proscribed by Section 17. The Commission, however, found that the Agreement did authorize the charge, but upheld the examiner's determination that it violated the Shipping Act
 
 
 [21]
 The Commission was unimpressed by petitioners' cost analysis because it involved a strike period. Other studies contained cost estimates for which no adequate foundation had been laid. Finally, the Commission was persuaded by the lightermen's evidence that several of the alleged extra expenses were compensated for and included in the charge made by the terminal operators to the steamship company
 
 
 [22]
 The examiner defined stevedoring, in the case of import cargo, as the process of breaking cargo out of stow in the ship's hold, lifting it from the vessel and depositing it on the pier's string piece and then carting it to the place of rest designated by the stevedore. The process is, of course, reversed in the case of export cargo. By custom of the port, the ocean carrier assumes responsibility to the shipper for performing this function. But in New York the work is actually performed by the terminal operators under contract with the carrier. The Commission found that where cargo is transferred directly to (from) the lighter from (to) the ship, this is a stevedoring function for which the terminal operator is paid by the carrier
 
 
 [23]
 This is so because the carrier's freight rate to the shipper, in the absence of a special handling charge, covers and includes the stevedoring charge. Sun Maid Raisin Growers Ass'n v. United States, N.D.Calif., 33 F.Supp. 959, 961 (1940), affirmed, 312 U.S. 667, 61 S.Ct. 830, 85 L.Ed. 1111 (1941). In addition, the shipper also pays for the increment in lighterage charges resulting from the payment which the lightermen must make to the terminal operators for the same stevedoring services
 
 
 [24]
 Under the Commission's order the lightermen will not pay any stevedoring charges for work done over the side. There is, then, a windfall when work is done over the side, in that the lightermen need not pay for services for which they must pay when comparable work is performed to the pier by the Spencer Company
 
 
 [25]
 It is interesting to note that petitioners did not except to the examiner's comparable finding regarding an unloading charge to truckers where there is a direct transfer from truck to vessel. This ruling, like the ruling on charges to lightermen, was based on the conclusion that direct transfer unloading of trucks was a stevedoring function paid for by the vessel. Consequently, any charge to the trucker resulted in a double charge on the cargo which violated Section 17
 
 
 [26]
 Section 5(c), 5 U.S.C. 554(d) (Supp. II 1965-66) (formerly 5 U.S.C. 1004(c) (1964 ed.)), provides in relevant part:
 '* * * such an employee (hearing examiner) may not--
 '(2) be responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for an agency.'
 
 
 [27]
 The relevant portion of section 5(c) provides:
 'An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 8 of this title, except as witness or counsel in public proceedings. * * *'
 Petitioners also allege that transmission of an ex parte memorandum violated the Commission's own Rules of Practice and Procedure, particularly Rule 10(dd), 46 C.F.R. 502.170 (Supp.1967).