SQUARE D COMPANY and Big D Building Supply Corp., Plaintiffs,

v.

NIAGARA FRONTIER TARIFF BUREAU INC.; Bondy Cartage Limited; Dominion-Consolidated Truck Lines Limited; ICL International Carriers Limited; Inter-City Truck Lines (Canada) Inc.; TNT Canada Inc., Defendants.

No. CIV–84–158C.

United States District Court, W.D. New York.

Sept. 25, 1984.

Foley & Lardner, Washington, D.C. (Douglas V. Rigler, Washington, D.C., of counsel), for plaintiffs.

William Randolph Smith, Crowell & Moring (Donald L. Flexner, Washington, D.C., of counsel), for defendants.

CURTIN, Chief Judge.

The court has deferred ruling on various pending discovery motions and a motion for class certification. Before the court is defendants' motion to dismiss. Fed.R.Civ.P. 12(c) and 12(h)(2).

The allegations in the complaint may be summarized as follows. The Niagara Frontier Tariff Bureau, Inc. [NFTB] is a motor carrier rate bureau with headquarters in Buffalo, New York. It is organized and operates under an agreement which has been filed with and approved by the Interstate Commerce Commission [ICC]. The NFTB is a defendant, along with various named common carrier defendants that are members of NFTB. These carrier defendants move goods between the United States and Canada.

Plaintiffs now allege that beginning in 1966 and continuing until about 1981, the defendants and their coconspirators entered into a conspiracy to fix prices and to eliminate or restrict competition for the transportation of goods between the United States and the Province o. Ontario.

Specifically, the plaintiffs allege that the defendants and their coconspirators "[p]articipated in a Principals Committee which was comprised of the senior management officials of NFTB carriers" but which "was not authorized or approved by the ICC to engage in rate-making conduct. [Complaint, ¶ 23(a).] Plaintiffs allege that this Committee was used to set rates and inhibit competition. This, the plaintiffs allege, was done by way of threats, coercion, and retaliatory rate reductions. Plaintiffs allege that all of this was accomplished in secret; none of these activities was disclosed to the ICC.

As a result, the plaintiffs claim violations of section 1 of the Sherman Act [15 U.S.C. § 1] and sections 4 and 16 of the Clayton

Act [15 U.S.C. §§ 15, 26] and seek treble damages for the loss of benefit of legitimately competitive rates.

Although two separate actions were filed by Square D Company and Big D Building Supply Corp., this court's order of June 27, 1984, directed that these two actions proceed as a consolidated suit. A third and similar action filed by the United States against NFTB has been discontinued by consent of the parties and by order of this court, *United States v. NFTB*, No. 83–1313 (W.D.N.Y. June 26, 1984). All that remains is this consolidated civil antitrust suit.

## I.

The defendants now move to dismiss, arguing failure to state a claim, and seek judgment on the pleadings. Defendants insist that *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), and its progeny completely bar plaintiffs' antitrust damage claims.

*Keogh*, like the plaintiffs in this case, was a shipper. The defendant railroads in the *Keogh* case formed an association and agreed to certain interstate freight rates which the ICC determined were reasonable and not discriminatory. Failing to convince the ICC that the defendants' rates were unlawful, *Keogh* filed a suit in federal court challenging the rates under the Sherman Act. The Court held that *Keogh* could not obtain antitrust damage against the defendant carriers based upon a carrier conspiracy to fix tariff rates which were filed with the ICC and subject to that agency's regulatory control.

The reasoning of *Keogh* was followed in *Georgia v. Pennsylvania Railway Co.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945). *Georgia* sought money damages as well as injunctive relief. The Supreme Court held that in light of *Keogh*, there was no basis for the recovery of money damages, even if the conspiracy alleged were shown to exist. The complaint in *Georgia* also alleged coercion and discrimination, but the Court held that this did not create a basis for shipper antitrust damage claim against carriers. An injunctive action, and even a criminal prosecution, may go forward, but a claim for treble damages under the antitrust statute may not.

To avoid the directives of the Supreme Court, plaintiffs now argue that *Keogh* does not apply because 1) subsequent legislation has diffused the authority of *Keogh*, and 2) the facts of the instant case amount to a "broader conspiracy" that does not fall within the purview of *Keogh*.

## II.

First, the legislative activity since *Keogh* has defined and preserved antitrust immunity where a rate agreement was implemented "in conformity with its provisions and in conformity with the terms and conditions prescribed by the Commission." Reed-Bulwinkle Act, 62 Stat. 472 (1948). The House Report supporting this legislation states that:

> [t]he bill leaves the antitrust laws to apply with full force and effect to carriers, so far as they are now applicable, except as to joint agreements or arrangements between them as may have been submitted to the [ICC] and approved by that body."

H.R.Rep. No. 1100, 80th Cong., 1st Sess., at 5 (1947), U.S.Code Cong.Serv. 1844, at 1848.

The Reed-Bulwinkle Act was intended "to dispel the uncertainty" about the rate bureaus' powers, for there was at that time a growing concern about the potential abuse of those powers. 94 Cong.Rec. A3888 (June 14, 1948) (remarks of Cong. Loa). It was not intended to *expand* antitrust liability. Certainly, this court may not infer that Congress had intended to alter the significance of the *Keogh* and *Georgia* rulings when the legislative history specifically states that the relationship with antitrust laws shall not be altered. *See* H.R.Report, *supra*.

Moreover, it is clear that courts since Reed-Bulwinkle have consistently applied *Keogh* without recognition of any legisla-

tive alteration of the dictates of the Supreme Court. *See, e.g., McLain v. Real Estate Board,* 444 U.S. 232, 243, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980); *Litton Systems, Inc. v. Amer. Tel. & Tel. Co.,* 700 F.2d 785, 820–21 (2d Cir.1983); *City of Groton v. Connecticut Light & Power Co.,* 662 F.2d 921, 929 (2d Cir.1981); *In re Wheat Rail Freight Rate Antitrust Litigation,* 1984–1 Trade Cas. (CCH) ¶ 65,861 (N.D.Ill.1984);. *Asbury Graphite, Inc. v. Dehyco Co.,* 1981–1 Trade Cas. (CCH) ¶ 63,980 (N.D.Cal.1980); *Monticello Heights, Inc. v. Morgan Drive Away, Inc.,* 1974–2 Trade Cas. (CCH) ¶ 75,282 (S.D.N.Y. 1974).

Plaintiffs argue that two cases illustrate a post-Reed-Bulwinkle departure from *Keogh.* The earlier, *Carnation Co. v. Pacific Westbound Conference,* 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966), concerns shipping, *not* motor carriers, and never mentions *Keogh.* The more recent, *Interstate Commerce Commission v. American Trucking Association, Inc.,* — U.S. ——, 104 S.Ct. 2458, 81 L.Ed.2d 282 (1984), specifically recognizes that antitrust immunity has limits. Under Reed-Bulwinkle and the more recent Motor Carrier Act, Pub.L. 96–296, 94 Stat. 793, rate bureaus must conform to specific guidelines in order to retain antitrust immunity. 49 U.S.C. § 10706(b)(3)(A), (B); *Interstate Commerce, supra,* 104 S.Ct. at 2461 n. 1. In short, neither case supports a view that Congress has in any way detracted from the Supreme Court's instruction in *Keogh.*

### III.

Plaintiffs' second position deserves careful address. The complaint specifically alleges that the defendants acted outside the scope of the NFTB agreement by "engaging in conduct that either was not or could not be approved by the ICC." [Complaint, ¶ 22.] The plaintiffs argue that this "broader conspiracy" places the defendants outside recognized antitrust immunity.

Justice Brandeis, writing for the court in *Keogh,* stated:

[U]nder the Anti-Trust Act, a combination of carriers to fix reasonable and non-discriminatory rates may be illegal; and if so, the Government may have redress by criminal proceedings under § 3, by injunction under § 4, and by forfeiture under § 6.... It does not, however, follow that Keogh, a private shipper, may recover damages under § 7 because he lost the benefit of rates still lower, which, but for the conspiracy, he would have enjoyed....

A rate is not necessarily illegal because it is the result of a conspiracy in restraint of trade in violation of the Anti-Trust Act. What rates are legal is determined by the Act to Regulate Commerce.... If the conspiracy here complained of had resulted in rates which the Commission found to be illegal because unreasonably high or discriminatory, the full amount of the damages sustained, whatever their nature, would have been recoverable in such proceedings....

The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier.

260 U.S. at 161–63, 43 S.Ct. at 49–50. The Court further explained:

This stringent rule prevails because otherwise the paramount purpose of Congress—prevention of unjust discrimination—might be defeated. If a shipper could recover under § 7 of the Anti-Trust Act for damages resulting from the exaction of a rate higher than that which would otherwise have prevailed, the amount recovered might, like a rebate, operate to give him a preference over his trade competitors.

Whatever the breadth of plaintiffs' allegations, the complaint essentially focuses on what plaintiffs claim are unjust and excessive rates. As the court in *Pinney Dock & Transport Co. v. Penn Central*

*Corp.,* 600 F.Supp. 859, 886 (N.D.Ohio 1983) (*"Pinney II"*—on reconsideration), recognized, there are attendant complications with respect to a damage calculation which depends upon a hypothetical rate, since rate determinations are a matter for the ICC and not for the court. Although the plaintiffs rely on *Pinney Dock* for the proposition that a "broader conspiracy" avoids *Keogh,* they cite the original opinion on motion to dismiss—not the later reconsideration motion. *Pinney Dock* 1983–2 Trade Cas. (CCH) ¶ 65,607 (N.D.Ohio 1983) ("Pinney I"). The later opinion of Judge Thomas clarifies two important points: 1) Pinney was claiming antitrust damage as a *competitor*—not a customer; and 2) "dismissal of the plaintiff's claim [when a *customer*] would appear then to be the only alternative." *Pinney II. See Monticello Heights, supra* (dismissal of shipper complaint despite allegations not only of price-fixing, but also of monopolization through coercive and exclusionary conduct).

Finally, "prior ICC approval of a rate does not influence the *Keogh* rule." *See Monticello, supra,* and *Asbury Graphite, Inc. v. Dehyco Co.,* 1981–1 Trade Cas. (CCH) ¶ 63,980 (N.D.Cal.1980) (shipper antitrust actions dismissed without regard to whether or not the ICC had approved the rates).

Although plaintiffs claim that some "larger conspiracy" like that recognized in *United States v. Bessemer and Lake Erie R.R. Co.,* 717 F.2d 593, 600 (D.C.Cir.1983), would evade *Keogh, Bessemer* involved a criminal proceeding—precisely the kind already instituted and dropped without indictment and upon consent of the parties in the instant civil action.

### IV.

In sum, this court is unpersuaded that plaintiffs have a right to maintain this suit. For these reasons, defendants' motion to dismiss is granted. Consequently, the remaining motions need not be addressed. The Clerk is directed to enter judgment dismissing the complaint.

So ordered.