**EMPIRE STATE HIGHWAY TRANS-
PORTATION ASSOCIATION,
INC., Petitioner**

v.

**FEDERAL MARITIME BOARD and
United States of America,
Respondents,**

**American Export Lines et al.,
Intervenors.**

**No. 15840.**

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 21, 1961.

Decided April 27, 1961.

Mr. Herbert Burstein, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. John A. Kendrick, Washington, D. C., was on the brief, for petitioner.

Mr. Frank Gormley, Attorney, Federal Maritime Board, of the bar of the United States District Court for the District of Columbia, pro hac vice, by special leave of court, with whom Messrs. James L. Pimper, General Counsel, Federal Maritime Board, Robert E. Mitchell, Asst. General Counsel, Division of Litigations, Federal Maritime Board, Edward Aptaker, Asst. General Counsel, Division of Regulations, Federal Maritime Board, and Richard A. Solomon, Attorney, Department of Justice, were on the brief for respondents.

Mr. Mark P. Schlefer, Washington, D. C., with whom Mr. T. S. L. Perlman was on the brief, for intervenors.

Before FAHY, DANAHER and BASTIAN, Circuit Judges.

FAHY, Circuit Judge.

Petitioner is an association of motor carriers engaged in the transportation of freight moving in foreign commerce from and to piers, docks and waterfront terminals in the Port of Greater New York. The carriers engage the services of various terminal operators, steamship

companies and stevedores. These include the intervenors, who operate ocean terminal facilities in the Port. They load or unload the cargo carried by the trucks of the motor carriers and destined for export or being imported by water.

Intervenors have formed a "conference" which is authorized to function under an agreement, referred to as the basic or conference agreement. This agreement is identified as FMB Agreement No. 8005, and was approved by the respondent Board March 23, 1955, under section 15 of the Shipping Act of 1916, set forth in the margin.[1] It is seen from the terms of section 15 that action taken in concert by members of a conference under an approved section 15 agreement is immunized from the operation of the antitrust laws, but that it is unlawful to carry out in whole or in part, directly or indirectly, any agreement, modification or cancellation thereof prior to approval by the Board.

The conference agreement grants the following authority to the parties to it:

"1. That they shall establish, publish and maintain tariffs containing just and reasonable rates, charges, classifications, rules, regulations and practices with respect to such services—the first such tariff to be established by the unanimous agreement of the parties hereto. The approval of not less than two-thirds of the parties represented at a meeting shall be required for any change, in addition to or deletion from said tariffs, issued as supplements thereto or as re-issues thereof.

"2. That they shall assess and collect rates and charges for and in connection with such services strictly in accordance with rates, charges, classifications, rules, regulations and practices set forth in said tariffs

---

1. § 15, 39 Stat. 733 (1916), as amended, 46 U.S.C. § 814 (1958), 46 U.S.C.A. § 814 provides:

"Every common carrier by water, or other person subject to this chapter, shall file immediately with the Federal Maritime Board a true copy, or, if oral, a true and complete memorandum, of every agreement, with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term "agreement" in this section includes understandings, conferences, and other arrangements.

"The Board may by order disapprove, cancel, or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discrimina-

tory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors or to operate to the detriment of the commerce of the United States, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations.

"Agreements existing at the time of the organization of the Board shall be lawful until disapproved by the Board. It shall be unlawful to carry out any agreement or any portion thereof disapproved by the Board.

"All agreements, modifications, or cancellations made after the organization of the Board shall be lawful only when and as long as approved by the Board, and before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation.

"Every agreement, modification, or cancellation lawful under this section shall be excepted from the provisions of sections 1–11 and 15 of Title 15, and amendments and Acts supplementary thereto.

"Whoever violates any provision of this section shall be liable to a penalty of $1,000 for each day such violation continues, to be recovered by the United States in a civil action."

and, further, shall not in any respect whatsoever deviate from or violate any of the terms or conditions or provisions of said tariffs, and no rates or charges assessed or collected pursuant to such tariffs shall be directly or indirectly refunded or remitted in whole or in part in any manner or by any device."

On January 15, 1960, the conference filed Tariff No. 5 with the Board, increasing the rates charged by its members to the members of petitioner some 15 per cent, effective February 15, 1960. The tariff also contains certain changes in regulations and practices affecting the business done by intervenors with petitioner's members.[2] The tariff was filed with the Board but was put into effect without Board approval. Intervenors considered the tariff not to be a section 15 agreement or modification which required approval in addition to the approval previously given the basic agreement itself.

Petitioner filed a complaint with the Board challenging the validity of Tariff No. 5 because of the absence of specific Board approval. On motion of intervenors, respondents before the Board, the complaint was dismissed, the order reciting,

"The Board and its predecessors consistently have held that the issuance and modification of tariffs pursuant to an approved basic agreement are not new agreements, or modifications of agreements, requiring prior section 15 approval. See Empire State H'W'Y Transp. Ass'n. v. American Export Lines, 5 F.M.B. 565, 585, 586 (1959)." [3]

Petitioner here seeks review of this order of the Board, the question being whether Tariff No. 5 requires Board approval under section 15.

In a literal sense the tariff is an agreement as to rates reached in concert by members of the conference. Section 15 in terms requires approval, in order to be lawful, of every agreement "fixing or regulating transportation rates or fares"; and we take it that the fixing and regulation of charges for services furnished by intervenors to members of petitioner are "transportation rates or fares." Nevertheless, the problem is not solved by a literal reading of some of the language of section 15. It must be solved by considering this language with other provisions of the statute in the light of a long legislative and administrative history.

Since 1927 the Board [4] has construed the expression "every agreement" in section 15 is not to include "routine operations relating to current rate changes and other day-to-day transactions." Section 15 Inquiry, 1 U.S.S.B. 121, 125 (1927). And "routine operations" has consistently been interpreted by the Board to include conventional rate changes. In 1959 in the proceedings of Empire State Highway Transp. Ass'n v. American Export Lines, Inc., 5 F.M.B. 565 (1959), involving intervenors' earlier Tariffs Nos. 3 and 4, the Board said, at page 585:

"We agree with the examiner and find that the tariffs are not modifications of the basic agreement or new agreements, within the meaning of section 15. The issuance of tariffs, including rates, charges, rules, and regulations covering the application of the tariffs, were authorized and contemplated by the approved basic agreement.

"The Board and its predecessors have uniformly held since Section 15 Inquiry, 1 U.S.S.B. 121 (1927), that the issuance of tariffs, including rules and regulations covering their

---

2. "We do not separately consider the regulations and practices, for if, as we hold, the rate increase is valid the same reasoning carries with it the validity of these particular regulations and practices."

3. Empire State Highway Transp. Ass'n v. American Export Lines, Inc., No. 894, FMB, May 18, 1960.

4. We use the word "Board" as including also the Board's predecessors.

application, have been routine matters authorized by an approved basic conference agreement, not requiring separate approval under section 15."

■ We think this is a reasonable construction of the terms of the basic agreement which authorize the conference to "establish * * * tariffs containing just and reasonable rates * * * regulations and practices." [5]

Thousands of rate changes have been agreed upon in concert by conference members in the maritime and related industries under the authority of approved conference agreements, and we are cited to no instance in which conventional rate changes have been held by Board or court to be unlawful because unaccompanied by prior Board approval. This long administrative practice is unusually impressive; and we do not believe that the Supreme Court intended to change its course by the statement in Isbrandtsen-Moller Co. v. United States, 1937, 300 U. S. 139, 146, 57 S.Ct. 407, 411, 81 L.Ed. 562, in passing upon a different question, that "the act requires that if any contract for a change of those rates is made the new rates may be charged only after the Board has approved the agreement." We think this reference to the language in section 15 was not intended as a construction of the provision in its application to such a case as the present, though our own case of Isbrandtsen Co. v. United States, 93 U.S.App.D.C. 293, 211 F.2d 51, certiorari denied, Japan Atlantic and Gulf Conference v. U. S., 347 U.S. 990, 74

S.Ct. 852, 98 L.Ed. 1124, demonstrates that a conference agreement is not a canopy under which to inaugurate without prior Board approval a dual contract system of charges or rates. As the Board argues, "A tariff change and modification of the basic agreement may sometimes be a matter of degree."

■ It is to be remembered also that the rates are subject to section 17 [6] of the Shipping Act regarding the observance of just and reasonable regulations and practices and, additionally, that when a conference has engaged in conduct violative of the fair and reasonable standards of the Act the Board may withdraw approval of the basic agreement itself, or require its modification.[7]

We would require clearer expression of its purpose to attribute to Congress, in light of the history of this problem, an intention to require every rate increase made through the procedures of an approved basic agreement to be approved by the Board in advance of effectiveness. This would make the present statute unworkable, unless approval were to be merely formal; for unless merely formal and, therefore, of little significance, approval would require notice to interested parties and a hearing with substantial and often protracted delays incident to administrative decision and judicial revew. We know of no rate regulation of this character, and we are reluctant to conclude that Congress intended a radical departure from its usual approach to such regulation.[8]

---

5. Petitioner does not challenge the justness or reasonableness of the rates and regulations contained in Tariff No. 5, but only their lawfulness as not having been approved under section 15 as a separate agreement or modification of an agreement.

6. 39 Stat. 734 (1916), as amended, 46 U.S.C. § 816 (1958), 46 U.S.C.A. § 816.

7. "An unreasonably high rate is clearly detrimental to the commerce of the United States, and upon a showing that a conference rate in foreign commerce is unreasonably high the Department will require its reduction to a proper level. If necessary, approval of the conference

agreement will be withdrawn." Edmond Weil, Inc. v. Italian Line, "Italia", 1 U.S.S.B.B. 395, 398 (1935).

8. The federal regulatory scheme typically calls for the maintenance of just and reasonable rates and charges which shall be filed with the appropriate agency. Changes in such rates and charges are to be accompanied by notice to the appropriate agency and the public, often thirty days. When given to the agency, suspension powers allow that effect may be withheld from rate changes but only for limited periods of time, at the expiration of which the rates become effective whether or not approved. Rates which become effective in such manner,

Moreover, when we consider the manner in which Congress has approached the problems of domestic water traffic under the Act, compared with the provisions applicable to intervenors, the view we adopt gains further support. Domestic carriers are required to adhere to filed rates and to give thirty days notice of changes; and the Board may suspend rates for not to exceed four months and fix maximum rates.[9] These provisions came into effect in 1933 when Congress was aware of the administrative interpretation under which foreign rates established under conference agreements were not required to have section 15 approval. See H.R.Rep. No. 2006, 72d Cong. 2d Sess. 4 (1933). To interpret section 15 to require such approval for foreign rates would attribute to Congress an intention to exercise more stringent controls over foreign than over domestic rates; for such an interpretation would mean indefinite suspension of foreign rate changes.[10] Yet nothing indicates Congress intended rate changes for foreign traffic to be more difficult than changes applicable to domestic trade. And the terminal operators whose rates are here questioned by petitioner are under the same regulations insofar as rates are concerned as are those engaged in foreign trade.

Approval of an administrative interpretation is not lightly to be laid at the door of Congress; but the evidence of awareness by Congress of the Board's interpretation over a very considerable period, during which Congress considered the legislation several times with no change in section 15 as administratively interpreted cannot be altogether ignored.[11] When the Shipping Act was before the House Committee of the Merchant Marine and Fisheries the distinction between the method by which rates were regulated under the Interstate Commerce Act and the method proposed in the Shipping Act was pointed out by one of the draftsmen of the latter, who stated that the carriers would work out their own rates without being obliged to file them with the Government unless they were joint interline rates of two connecting carriers.[12] The distinction between this and the provisions of the Interstate Commerce Act was adverted to.[13] And the testimony indicates that the distinction held as to conference rates as well as to those of an individual carrier.

The long practice of the Board, beginning no later than 1927, of permitting tariffs to be filed for information and to become effective without approval has been set forth in reports to Congress, in-

---

however, may be the subject of recalculation or disapproval upon the later termination of hearings to determine the lawfulness of such rates. See, e. g., Interstate Commerce Act, §§ 6, 15(7), 24 Stat. 380 (1887), 44 Stat. 1447 (1927), as amended, 49 U.S.C. §§ 6(1), 6(3), 15 (7) (1958), 49 U.S.C.A. §§ 6(1, 3), 15 (7); Motor Carrier Act, §§ 216(a) (g), 217(c) (1935), as amended, 49 U.S.C. §§ 316(a), (g), 317(c) (1958), 49 U.S.C.A. §§ 316(a, g), 317(c); Natural Gas Act, § 4, 52 Stat. 822 (1938), 15 U.S.C. § 717c (1958), 15 U.S.C.A. § 717c; Federal Aviation Act, §§ 403(a), (c), 1002 (g), 72 Stat. 758–759, 790, 49 U.S.C. §§ 1373(a), (c), 1482(g) (1960), 49 U.S. C.A. §§ 1373(a, c), 1482(g).

9. Intercoastal Shipping Act, § 2, 47 Stat. 1425 (1933), 46 U.S.C. § 844 (1958), 46 U.S.C.A. § 844.

10. The established practice of filing rate tariffs agreed to under conference procedures, for information, is not to be confused with filing for prior approval.

11. See Service v. Dulles, 354 U.S. 363, 380, 77 S.Ct. 1152, 1 L.Ed.2d 1403; United States v. American Trucking Ass'ns, 310 U.S. 534, 549–550, 60 S.Ct. 1059, 84 L.Ed. 1345; N. L. R. B. v. Gullett Gin Co., 340 U.S. 361, 366, 71 S.Ct. 337, 95 L.Ed. 337; Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294, 313, 53 S.Ct. 350, 77 L.Ed. 796.

12. Hearings on Regulatory Features of Shipping Bill Before the House Committee on the Merchant Marine and Fisheries, 64th Cong., 1st Sess. 17 (1916) (testimony of Dr. Emory R. Johnson).

13. Id. at 35.

cluding the report of Section 15 Inquiry, supra, preceding the enactment of the Merchant Marine Act of 1928.[14] Moreover, the Section 19 Investigation of 1935, 1 U.S.S.B.B. 470, was brought to the attention of Congress in the Board's annual report for 1935 and 1936 [15] when Congress was revising the Shipping Act of 1916 and transforming it into the Merchant Marine Act of 1936.[16] Finally, in the wake of Federal Maritime Board v. Isbrandtsen Co., 1958, 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926, Congress moved to preserve the status quo as far as dual rate arrangements affected by that decision were concerned.[17] In 1959 the Board again reported its practice with respect to tariffs filed pursuant to section 15 agreements. The Chairman of the Board testified:

"The regulation of water carriers in the foreign trade of the United States is substantially different from the regulation of carriers in our domestic trades. The Board has been given no direct control over the reasonableness of rates in the foreign trade. It may not prescribe either maximum or minimum rates in these trades; in fact, it has little to say as to the measure of the rates of common carriers by water serving our foreign trade. There is no requirement for the advance filing of freight rates in the foreign trade, nor any authority to suspend these rates. However, by its General Order 83, the Board requires common carriers by water in the foreign trade to file their export rates within a period of 30 days after they have become effective and it requires a similar filing of all rates established by common carriers by water pursuant to any agreement subject to the Board's jurisdiction. * * *

"There are 125 steamship conferences covering the various freight trades of the United States. The minutes and records of their meetings, and their rates and practices, are filed with the Board and are examined so far as staff limitations permit to ascertain whether actions taken are within the authority of their approved agreements and are not contrary to provisions of law or decisions of the Board or the courts." [18]

A description by the Board of its section 15 practices was also given to the House Antitrust Subcommittee in 1959. The Board then recommended that "All conferences and nonconference [sic] berth services should be required to file their rates with the Federal Maritime Board 90 days in advance of their effective date," and that the rates duly filed should be the only rates charged.[19] This recommendation has not been enacted into law. The extension by Congress of the "status quo" legislation above referred to was on the background of this information that currently there was no requirement that conference rates receive section 15 approval before becoming effective. If a different position is now to be adopted we think it should be at the hands of Congress rather than required by the courts.

Affirmed.

14. 45 Stat. 690 (1928), 46 U.S.C. § 891 et seq. (1958), 46 U.S.C.A. § 891 et seq.

15. Report of the United States Maritime Commission 16 (1936).

16. 49 Stat. 1985 (1936), 46 U.S.C. § 1101, et seq. (1958), 46 U.S.C.A. § 1101 et seq.

17. Act of June 29, 1960, P.L. 86–542, 74 Stat. 253, 46 U.S.C.A. § 812 note; Act of August 12, 1958, P.L. 85–626, 72 Stat. 574, 46 U.S.C.A. § 812 and note.

18. Hearings Before the Special Subcommittee on Steamship Conferences of the House Committee on Merchant Marine and Fisheries, 86th Cong., 1st Sess. 3–4 (1959).

19. Hearings Before the Antitrust Subcommittee of the House Committee on the Judiciary, 86th Cong., 1st Sess. 172–73 (1959).