**PACIFIC WESTBOUND CONFERENCE, and Far East Conference, Petitioners,**

v.

**FEDERAL MARITIME COMMISSION and United States of America, Respondents,**

**Board of Commissioners of the Port of New Orleans, the Port of New York Authority, et al., Intervenors.**

No. 23506.

United States Court of Appeals, Fifth Circuit.

March 19, 1971.

Rehearing Denied April 28, 1971.

R. Frederic Fisher, Edward D. Ransom, San Francisco, Cal., and Donald A. Lindquist, New Orleans, La., for Pacific Westward Conference.

Elkan Turk, Jr., New York City, for Far East Conference.

James L. Pimper, Gen. Counsel, New Orleans, La., Edward Gruis, Deputy Gen. Counsel, Kenneth Burns, Sol., Joseph F. Kelly, Jr., Walter H. Mayo, III, and Norman C. Barnett, Attys., Federal Maritime Commission, Washington, D. C., and Irwin A. Seibel, Atty., Dept. of Justice, for Federal Maritime Commission and United States.

Mark P. Schlefer, James M. Henderson, Washington, D. C., and Arthur B. Dunne, San Francisco, Cal., for intervenors.

Before THORNBERRY, GOLDBERG and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

This petition for review of the report and orders of the Federal Maritime Commission in a case of substantial importance involving ocean freight rates, was filed by Pacific Westbound Conference and Far East Conference, two major conferences or associations of common carrier shipping companies engaged in transporting cargo between ports in the United States and the Far East.[1] The question presented by petitioners is whether we should reverse the Commission and permanently enjoin its decision. We are asked to hold that the two conferences were authorized to act jointly in fixing ocean freight rates under the provisions of an agreement previously approved by the Commission, and then to find that certain supplementary agreements made thereafter were authorized under the Commission's approval of the basic agreement. The Ports of New York and New Orleans, and the Carnation Company, a shipper, have intervened.

The case is directly related to another petition for review filed contemporaneously by the Ports of New York and New Orleans to portions of the same Federal Maritime Commission report and orders. We have decided that case today by separate opinion.

The proceedings began with an order by the Federal Maritime Board (now Commission) dated October 26, 1959 in Docket No. 872, entitled *Joint Agreement Between Member Lines of the Far East Conference and the Member Lines of the Pacific Westbound Conference.* On the Board's own motion an investigation was instituted into Agreement No. 8200, a joint agreement relating to ocean freight rates between the member lines of the Far East Conference (FEC) and Pacific Westbound Conference (PWC), which agreement had been previously approved by the Board pursuant to Section 15 of the Shipping Act, 1916 (46 U.S.C. § 814). The Board sought to determine whether Agreement No. 8200 was a complete agreement within the meaning of Section 15, and whether it was being carried out in accordance with the Shipping Act, 1916, as amended (46 U.S.C. §§ 801–842 (1964 ed.)). The two conferences, FEC and PWC, were made respondents by the Board.

A brief history of the two conferences is necessary and helpful to an understanding of our decision in this case. Pacific Westbound Conference, a conference or association of ocean carriers operating from Pacific Coast United States ports to the Far East, is an approved conference pursuant to Agreement No. 57 which was filed and approved by the Commission under Section 15 of the Act effective on January 1, 1923. The Far East Conference is a similar conference of ocean carriers operating from Atlantic and Gulf Ports of the United States to the Far East and its agreement was originally approved under Section 15 of

---

1. Jurisdiction to review in this case was invoked pursuant to Section 2 of the Judicial Review Act of 1950 (5 U.S.C. § 1032). That Act, now repealed, is replaced by substantially the same revisions in 28 U.S.C. §§ 2341–52, especially Section 2342(3) thereof.

The petition was originally filed in the United States Court of Appeals for the Ninth Circuit but transferred to this Court on motion of the Federal Maritime Commission (see 28 U.S.C. § 2112(a)) because of the earlier filing of the contemporaneous petition of the Ports in No. 23209.

the Act as Agreement No. 17 by the Commission under provisions of Section 15 on November 14, 1922.

Later, these two conferences, which are separate associations and highly competitive to each other in the United States-Far East trade, entered into a joint conference agreement affecting ocean shipping rates, Agreement No. 80, which received Commission approval under Section 15 in August 1925. The agreement lasted five years, and was dissolved by the conferences effective December 15, 1930. Economic and competitive warfare between the conferences resulted and a member of the Commission and staff employees of the Commission urged renewal of a joint agreement between them to end the destructive rate war between carriers. Accordingly, the conferences again entered into a joint agreement designed to restore stability of ocean rates, Agreement No. 8200, which was approved by the Commission under Section 15 of the Act on December 29, 1952.

The Commission's investigation disclosed, however, that there were supplementary agreements in force between PWC and FEC pursuant to Agreement No. 8200, "affecting overland rates, the concurrence procedures, and the placement of items on the initiative list," which had never been filed with or approved by the Commission under Section 15. PWC and FEC were directed by the Commission's order of July 28, 1965 to cease and desist from carrying out the supplementary agreements until filed or approved by the Commission, as required by Section 15.

The Commission in its report (8 F.M. C. 553) found that Agreement No. 8200 was "nothing more than evidence of the general intention of the parties to enter into concerted ratemaking. It sets out no details, no procedures, with the exception of the procedures to be taken at the initial meeting, nor does it inform any interested person as to how the agreement is to work." Id. at 558. The Commission held that the supplementary agreements relating to ratemaking initiative, overland rates, rate dif-

ferentials and the concurrence procedures for placement of items on the initiative list were without sanction and that under the basic Agreement No. 8200, Section 15 filing and approval were required. The Commission held, therefore, that use of the supplementary agreements without prior approval was a violation of that section of the Act. In the order on petition for clarification dated November 1, 1965, the Commission significantly added to its July 28, 1965 report the further finding that " * * * there exists no *approved* agreement which permits joint rate action between PWC and FEC." (Emphasis by the Commission.)

Petitioners PWC and FEC seek reversal of the Commission's holding that its approval of Agreement No. 8200 did not permit joint rate action between the two conferences, which finding is alleged to be manifestly erroneous and also contrary to the plain meaning of the agreement. They also ask that we hold that the supplementary agreements were lawful under the basic agreement. They request that we suspend and enjoin the enforcement of the Commission's report and orders insofar as they prevent petitioners from acting jointly in fixing ocean rates.

In the meanwhile, Carnation Company, an intervenor in the Commission proceeding, filed a treble damage antitrust suit under the Sherman and Clayton Acts (15 U.S.C. §§ 1–2, 15 U.S.C. § 15) against PWC and FEC in the United States District Court for the Northern Division of California, in connection with the fixing of rates for the transportation of evaporated milk to the Far East which had been carried out under the procedures provided for in the supplementary agreements between the two conferences. Carnation Company contended that the rates charged for transportation of its cargo, having been implemented under the unapproved supplementary agreements, were unlawful per se under the antitrust laws. The Supreme Court, reversing the Ninth Circuit which had sustained the District Court's granting of a motion to

dismiss (336 F.2d 650 (1964)), held that the Shipping Act, 1916, gave the shipping industry only a limited antitrust exemption. Respondent Pacific Westbound Conference's contention that the Act had repealed all antitrust regulations concerning the ratemaking activities of the shipping industry was rejected. The Supreme Court remanded the case to the District Court "with instructions to stay the action pending the final outcome of the Shipping Act proceedings [in Docket No. 872] and then to proceed in a manner consistent with this opinion." Carnation Co. v. Pacific Westbound Conf., 383 U.S. 213, 224, 86 S.Ct. 781, 788, 15 L.Ed.2d 709 (1966). Carnation's claim, therefore, awaits the outcome of the appeal in the present case.

There are, of course, conflicting views about the import of Agreement No. 8200.[2] The Commission held that Agree-

2. The text of Agreement No. 8200 is of critical importance and is, therefore, reproduced in full as follows:

Federal Maritime Board
Agreement No. 8200
Far East Conference and Pacific Westbound Conference.

Agreement made in the City of New York this fifth day of November, 1952, by and between the parties who shall execute this Agreement at the foot hereof under the caption "Members of the Pacific Westbound Conference", who are hereinafter sometimes collectively referred to as the Pacific Lines, and the parties who shall execute this Agreement at the foot hereof under the caption "Members of the Far East Conference", who are hereinafter sometimes collectively referred to as the Atlantic/Gulf Lines.

Witnesseth:

1. The Pacific Lines are parties to an agreement which has been designated Federal Maritime Board Agreement No. 57, as amended, which designates the parties thereto as the Pacific Westbound Conference; and whenever reference is hereinafter made to action which is required or permitted to be taken by the Pacific Lines, such reference is intended to refer to action such as is required to effect the establishment or change of rates pursuant to said Agreement No. 57, as amended.

2. The Atlantic/Gulf Lines are parties to an agreement which has been designated Federal Maritime Board Agreement No. 17, as amended, which designates the parties thereto as the Far East Conference; and whenever reference is hereinafter made to action which is required or permitted to be taken by the Atlantic/Gulf Lines, such reference is intended to refer to action such as is required to effect the establishment or change of rates pursuant to said Agreement No. 17, as amended.

3. The Pacific Lines operate vessels as common carriers of cargo from Pacific Coast ports of the United States and Pacific Coast ports of Canada to certain ports in the Far East; and the Atlantic/Gulf Lines operates vessels as common carriers of cargo from United States Atlantic and Gulf ports to some of the same ports in the Far East; and action taken hereunder shall apply to transportation of cargoes to all destinations which shall, from time to time, be common to the scope of both Agreements 57 and 17.

4. *The purpose which the parties desire to accomplish hereby (which is hereinafter sometimes for brevity referred to as "the purpose of this agreement") is to assure to the parties hereto, as well as to the manufacturers, merchants, farmers and labor, whose products are exported from the United States to Far East destinations which may, from time to time, be common to the scope of both said Agreements 57 and 17, stability of ocean rates and frequency, regularity and dependability of service which is essential to their continued prosperity; and for the accomplishment of the purpose of this agreement it is essential that the parties shall, from time to time, establish the rates to be charged for the transportation of commodities, and the rules and regulations governing the application of said rates*, except for the following commodities when shipped in bulk:

Coal, Coke, Phosphate Rock, Salt, Ores, Wheat, Barley, Rice, Corn, Soyabeans, Oats, Rye;

which excepted commodities are not included within the scope of this agreement.

Now, Therefore, in consideration of the premises and of the mutual undertakings of the parties hereto, it is hereby agreed as follows:

*First: As promptly as possible after the approval of this agreement by the Federal Maritime Board, the parties shall hold a meeting which is hereinafter referred to as the "initial meeting".* The initial meeting shall be held at a time and place to be mutually agreed upon by the parties hereto. If, however, prior to the 30th day after such approval the parties hereto shall not so have mutually agreed upon the time and place for the holding

of the initial meeting, said initial meeting shall be held on the 40th day after such approval at the Fairmont Hotel in the City of San Francisco, California; and if such 40th day shall fall on a Saturday, Sunday or legal holiday, said meeting shall be held on the second business day thereafter, at the same place. Such meeting shall be attended by representatives of the Pacific Lines and of the Atlantic/Gulf Lines. All matters coming before the initial meeting for consideration and action shall be determined only by a concurrence of the Pacific Lines, acting as a group, and of the Atlantic/Gulf Lines, acting as a group, each in accordance with the procedures prescribed by its respective Conference Agreement, with respect to the establishment or change of rates. *The initial meeting shall make rules, not inconsistent with the provisions of this agreement, for the conduct of all meetings to be held hereunder, and for the transaction of such other business as the parties may be permitted to conduct by virtue hereof, including the provision of the machinery for the change of any rates, rules or regulations adopted at the initial meeting or at any subsequent meeting.*

Second: Anything contained herein or in the rules and regulations adopted at the initial meeting as from time to time amended to the contrary notwithstanding, *if either group of Lines should determine that conditions affecting its operations require an immediate change in its tariffs, it may notify the other group thereof,* specifying the changes which it proposes to put into effect 48 hours after the giving of such notice if given by telegram, or 72 hours after the giving of such notice if given by air mail, and a summary of the facts which justify the changes on said short notice. Forty-eight hours, or 72 hours, after the giving of such notice, dependent upon the medium by which such notice shall have been given, the notifying group may make such changes as stated in said notice and the other group may, at the end of 48 hours, or at the end of 72 hours, as the case may be, after the giving of such notice, make such changes in its tariffs as it may see fit and the action of the groups so taken shall not constitute a breach or violation of this agreement. *The parties shall, however, promptly give to the Governmental agency charged with the administration of Section 15 of the Shipping Act, 1916, as amended, copies of any notices and information with respect to any changes in tariffs given or made as provided for in this Article Second.*

*Third: The parties hereto shall, promptly after the adjournment of the initial meeting and of each subsequent meeting, file with the Governmental agency charged with the administration of Section 15 of the Shipping Act, 1916, as amended, a record of all business transacted at said respective meeting.*

Fourth: Neither the Pacific Lines nor the Atlantic/Gulf Lines shall admit new parties to their Conference Agreement unless such parties shall simultaneously become parties to this agreement by affixing their signatures under the appropriate caption or captions at the foot of this agreement or a counterpart thereof. Whenever any party hereto shall have ceased to be a party to Agreement No. 57 as amended, or a party to Agreement No. 17 as amended, or a party to both of said agreements, as the case may be, such party by such cessation shall cease also to be a party to this agreement; but so long as such party shall continue to be a party to either said Agreement No. 57 as amended, or Agreement No. 17 as amended, it shall also continue to be a party to this agreement. Prompt notice of the change of parties hereto shall be given by each group to the Governmental agency charged with the administration of Section 15 of the Shipping Act, 1916, as amended.

Fifth: Any notice required or permitted hereby to be given shall be given by telegram if telegraphic communication is available, otherwise by air mail, and if given to the Pacific Lines shall be addressed to the Secretary-Manager of the Pacific Westbound Conference at San Francisco, California, and if given to the Atlantic/Gulf Lines shall be addressed to the Chairman of the Far East Conference, 11 Broadway, New York 4, New York. The deposit of any such notice air mail, postage prepaid, in a United States Post Office letter box, or the deposit of any such telegram in an office of any telegraphic company, as the case may be, shall constitute the giving of such notice. Each of the groups of lines may, from time to time, change the address to which notices to it are to be dispatched by notice given to the other group.

Sixth: *This agreement shall become effective when, but not until, the same shall have been approved by the Federal Maritime Board, pursuant to the provisions of Section 15, Shipping Act, 1916, as amended.*

Seventh: Each Line, a party hereto, shall bear the expenses of its own representatives while attending any meetings held under the provisions hereof. The expenses of hiring the places where the

ment No. 8200 merely provided the basis for an initial meeting of the two conferences at which rules for the conduct of meetings and transaction of business and machinery for change of rates, rules or regulations would be established—in effect, that it was a general intention or agreement to enter into an agreement. The Commission further held that its approval of the agreement did not constitute an approval of joint ratemaking between the two conferences, though paradoxically it found "insufficient evidence to disapprove Agreement No. 8200." On the other hand, PWC and FEC contend that the agreement expressly provided for and clearly contemplated joint conference ratemaking and that the supplementary agreements were necessary implementations of the approved agreement; that to determine more than eleven years after approving Agreement No. 8200 that there is no authority for joint rate action is in effect to revoke substantive rights already conferred by the initial Section 15 approval of the joint agreement and thereby subject the conferences to unjust and unfair treble damage suits by shippers under the federal antitrust statutes. Among other things, they point to the fact that the Commission urged that they enter into a joint ratemaking agreement, to the informal prior approval of the text of the agreement by the Regulation Office staff, to the notice in the Federal Register of the filing of Agreement No. 8200 which stated that the agreement provided for the establishment by joint action of the rates to be charged, and to the antecedent joint ratemaking agreement between the conferences (Agree-

ment No. 80) made under Commission approval. They state that for many years thereafter, until the present decision, the Commission recognized that the agreement provided for joint ratemaking.

Carnation Company argues that Agreement No. 8200 "admittedly permits some interchange between PWC and FEC on matters of common concern," but that there is no provision authorizing joint ratemaking; and, further, they contend that the Supreme Court called the agreement only an "agreement for consultation." Carnation Company v. PWC, 383 U.S. 213, 223, n. 6, 86 S.Ct. 781, 787, n. 6 (1966). Carnation asserts that the supplementary agreements to Agreement No. 8200 were entered into somewhat later than the original agreement, and that a reading of Agreement No. 8200 would not inform the public or a shipper that such supplementary agreements were contemplated or would be made.

The Ports contend that the Commission's decision in Docket No. 872 is irreconcilable with the Commission's later decision in the overland rate case, Docket No. 65–31, affirmed by this Court in Port of New York Authority v. Federal Maritime Commission, 5 Cir., 1970, 429 F.2d 663, cert. denied, 401 U.S. 909, 91 S.Ct. 867, 27 L.Ed.2d 806 (1971). They reiterate their contention that this Court erred in affirming the Commissioner's report and order in *Port of New York Authority, supra.*

There is no mention in Agreement No. 8200 of the initiative and concurrence procedures of the two conferences which were the subject of supplementary agree-

---

meetings shall be held and such expenses incidental thereto as may be for the joint benefit of all of the parties hereto, shall be borne to the extent of one half thereof by the Pacific Lines as a group and one half thereof by the Atlantic/Gulf Lines as a group.

Eighth: *This agreement shall continue in effect for a period of nine months and shall continue thereafter* until the ninetieth day after any one or more of the Lines, a party or parties hereto, shall have given

to the Pacific Lines and to the Atlantic/Gulf Lines and to the Governmental agency charged with the administration of Section 15 of the Shipping Act, 1916, as amended, notice of termination; and on said ninetieth day this agreement shall terminate and come to an end.

In Witness Whereof, the parties hereto have caused this agreement to be executed by their respective officers or representatives and duly authorized as of the day and year hereinabove first written. (Emphasis by the Court.)

\*        \*        \*        \*        \*

ments.[3]  They were not agreed to until May 1955 and May 1956 following approval of Agreement No. 8200 by the Commission in 1952.[4]  The effect of the initiative and concurrence procedures is to give to each conference veto power over the rates of the other.  In our view the supplementary agreements were not routine ratemaking such as occurs between members within a single conference.  Interstitial, day-by-day adjustments of administrative details and tariff charges, within a conference between its members may be considered mere routine matters not requiring Section 15 approval.  Here, however, there were significant agreements between two competitive conferences relative to ratemaking, conferring to each the power of veto over the rates of the other.  As we have already pointed out, none of the supplementary agreements was filed with the Commission for approval.

■  We hold, therefore, that the supplementary agreements were not contemplated by the plain language of Agreement No. 8200 and that they could not be lawfully entered into without prior Section 15 filing and approval of the Commission.  Here the Commission's duty was to "scrutinize the agreement[s] to make sure that the conduct thus legalized does not invade the prohibitions of the anti-trust laws any more than is necessary to serve the purposes of the regulatory statute."  Isbrandtsen Co., Inc. v. United States, 1954, 93 U.S.App.D.C.

293, 211 F.2d 51, 57, cert. denied sub nom., Japan-Atlantic and Gulf Conf. v. United States, 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954).  In addition, the subsequent agreements unlawfully affect the organic conference agreements of PWC Agreement No. 57 and FEC Agreement No. 17 since these conferences, whose power to fix rates among the members of each conference respectively, was approved by the Commission, may not do so under the supplementary agreements because of the initiative and concurrence procedures agreed to by PWC and FEC.

■  The Commission was not estopped as a matter of law by the knowledge alleged to be had by the Commission and its staff concerning the manner in which the two conferences operated under Agreement No. 8200 and the supplementary agreements.  See Kempner v. Fed. Maritime Com., 1963, 114 U.S.App.D.C. 195, 313 F.2d 586, 587, cert. denied sub nom., Gulf/Mediterranean Ports Conf. v. Fed. Mar. Com., 375 U.S. 813, 84 S.Ct. 42, 11 L.Ed.2d 48 (1963).[5]  It is, of course, not contended that the supplementary agreements were submitted either formally or informally to the Commission for approval.  The information which the Commission received about the operations of the conference under Agreement No. 8200 was somewhat abbreviated, and the public and the Commission were not informed of the manner in which these supplementary agree-

3.  Agreement No. 8200 does contain a passing reference to concurrence procedure in Paragraph First, the pertinent provision reading as follows:
"All matters coming before the initial meeting for consideration and action shall be determined only by a concurrence of the Pacific Lines, acting as a group, and of the Atlantic/Gulf Lines, acting as a group, each in accordance with the procedures prescribed by its respective Conference Agreement, with respect to the establishment or change of rates."

4.  The May 1955 agreement was as follows:
"The Conference having the rate-making initiative on a commodity may not

change the rate basis, terms and conditions, or open or close the rate of that commodity without concurrence from the other Conference."
The May 1956 agreement was as follows:
"Authority to establish rate-making initiative on commodities, pursuant to the formula defined in the preceding paragraph, may only be granted to the Conference desiring such initiative after concurrence by the other Conference."

5.  In *Kempner*, the Court held that certain discriminatory dual rates were not approved by the regulatory agency merely because it was silent concerning them, and that the rates were, therefore, illegal.

ments were being carried out. The conference minutes indicate that the meetings were confidential, that each conference member was required to respect this confidence, and that unauthorized disclosure to shippers regarding rate changes and the position of an individual conference or any member thereof was contrary to the spirit of the joint agreement.[6] It was not known that each conference had veto power over the rates of the other. As the Commission later said in the Overland Rate case of this practice (with which we concur), "a system of 'concurrences' and 'initiative items' under which one conference in effect surrendered its right even to initiate consideration of certain rate changes without the prior concurrence of the other .* * * was hardly within the contemplation of ordinary ratemaking procedure." Investigation of Overland/OCP Rates & Absorptions, 12 F.M.C. 184, 213 (1969). We have no difficulty, therefore, in finding that the supplementary agreements were not incidental to or implementation of the basic conference agreement, and were certainly not routine as that term is de-

scribed in Ex Parte 4, Section 15 Inquiry, 1 U.S.S.B. 121, 125, or as such agreements are referred to in Isbrandtsen Co., Inc. v. United States, 1954, 93 U.S.App.D.C. 293, 211 F.2d 51, 56, cert. denied sub nom., Japan-Atlantic and Gulf Conf. v. United States, 347 U.S. 990, 74 U.S. 851, 98 L.Ed. 1124 (1954).[7] See also American Export & Isbrandtsen Lines v. F. M. C., 9 Cir., 1964, 334 F.2d 185, where the Court sustained the Commission in its holding that a port equalization agreement between conference members was not within the scope of the basic conference agreement. Cf. Empire State Highway Trans. Assn. v. Fed. Maritime Board, 1961, 110 U.S.App.D.C. 208, 291 F.2d 336, cert. denied, 368 U.S. 931, 82 S.Ct. 360, 7 L.Ed.2d 194 (1961).

■ We are in disagreement, however, with the Commission holding that Agreement No. 8200 did not permit joint ratemaking between PWC and FEC. We find that the facts and circumstances overwhelmingly support a holding that the agreement which was expressly approved by the Commission did authorize joint ratemaking.[8] The following is a

---

6. The conferences' minutes of Joint Meeting No. 1—January 1953:
   "(a) The proceedings of meetings are confidential and both Conferences and every Member are duty bound to respect this confidence and no information in regard to changes in rates, practices, etc., or positions taken are to be disclosed unless authorized by joint Conference action."
   Minutes of Joint Meeting No. 3—September 1954 further provide:
   "(c) It is the understanding of both Conferences that unauthorized disclosure to shippers of information regarding rate changes and/or the position of an individual Conference or any Member thereof, regarding rate requests in [sic] contrary to the spirit of the Joint Agreement."

7. In *Isbrandtsen*, the D.C. Circuit held that under Section 15 of the Act, a scheme of dual rates involved an agreement, or at least a modification of an existing basic agreement which "can hardly be classified as an interstitial sort of adjustment since it introduces an entirely new scheme of

rate combination and discrimination not embodied in the basic agreement." Separate Commission approval was, therefore, necessary.

8. An interesting observation in this connection (with which we agree) is made by PWC counsel in opening brief filed January 12, 1967, as follows:
   "The 'supplementary' agreements, which, according to the Commission, departed from and amended this authority have nothing to do with the joint rate authority itself, which was contained in the Joint Agreement. This right to agree on rates to be charged was the whole purpose of the Agreement; it was what the Board members had urged on the parties; it was the core of the Board's description of the Joint Agreement in its public notice thereof; it was the authority for joint action that the parties took for years with the full knowledge of the Board; it was a right that members of the Board and its staff continued to state publicly was provided in the Joint Agreement." (P. 35.)

summary of the salient particulars which uphold our conclusion:

(1) The background history shows that the two conferences admittedly had an antecedent joint ratemaking agreement (Agreement No. 80), approved by the Commission, which subsisted for a five-year period;

(2) After that agreement was dissolved and competitive rate warfare ensued between the conferences, they were urged by a member of the Commission and staff members in the Regulation Office to renew the agreement;

(3) Thereafter, the proposed new joint conference agreement was prepared and submitted informally for review and opinion to the Regulation Office to determine if it would be recommended; the informal comments of the Regulation Office were then contained in a new draft which became Agreement No. 8200;

(4) The Federal Register notice published by the Commission relative to Agreement No. 8200 gave twenty days' notice to interested parties to file approval or disapproval, and specifically referred to the provision relative to the contemplated establishment "by joint rate action of the rates to be charged" between the two conferences;

(5) Agreement No. 8200 was approved under Section 15 by the Commission which must have considered it a complete agreement on its face or it would not have approved it;

(6) Agreement No. 8200 cannot properly be considered merely an intention to make a subsequent agreement, for if so, Section 15 approval which was granted by the Commission would not have been required, since an agreement to agree "does not constitute such an agreement" and approval is necessary "only when a final agreement had been concluded." See Transshipment and Apportionment Agreements from Indonesian Ports to U. S. Atlantic and Gulf Ports, 10 F.M.C. 183, 196 (1966); see also Transshipment and Through Billing Arrangement Between East Coast Ports of South Thailand and U. S. Atlantic and Gulf Ports, 10 F.M.C. 201, 215 (1966).

(7) Joint ratemaking by the two conferences continued for more than a decade under Agreement No. 8200 and rate stability was restored in the United States-Far East trade;

(8) The Ninth Circuit in Carnation Co. v. PWC, 336 F.2d 650, 665 (1964), though reversed on other grounds by the Supreme Court, held that Agreement No. 8200 provided for joint ratemaking between the two conferences in a detailed, well-reasoned discussion, with which we concur; [9]

(9) Though it is arguable that Agreement No. 8200 is ambiguous insofar as whether it provided for joint ratemaking, we conclude that a fair reading of the entire instrument requires a finding that it obviously contemplated joint rate action between PWC and FEC. The plain language of the agreement unmistakably shows that the parties were entering into a joint ratemaking procedure. For example, in Witnesseth, Par. 4 of the Agreement, we find the following: "The purpose which the parties desire to accomplish hereby * * * is to assure to the parties hereto, as well as to the manufacturers, merchants, farmers and labor, whose products are exported from the United States to Far East destinations which may, from time to time, be

9. Judge Pope for the Court said:
"This calls for a reference to Agreement No. 8200 which was made a part of the record before the district court. We have noted that it expressly provided for and obviously contemplated the establishment of rates by agreements between both conferences. This approved agreement expressly provided that rates should be determined only by a concurrence of the two conferences each acting as a group and in accordance with the procedures prescribed by its conference agreement with respect to the establishment or change of rates."

**1312**

common to the scope of both said Agreements 57 and 17, stability of ocean rates and frequency, regularity and dependability of service which is essential to their continued prosperity; and for the accomplishment of the purpose of this agreement it is essential that the parties shall, from time to time, establish the rates to be charged for the transportation of commodities, and the rules and regulations governing the application of said rates * * *."

Paragraph First of the Agreement expressly provided for a first or "initial meeting" which "shall make rules, not inconsistent with the provisions of this agreement, for the conduct of all meetings to be held hereunder, and for the transaction of such other business as the parties may be permitted to conduct by virtue hereof, including the provision of the machinery for the *change of any rates, rules or regulations* adopted at the initial meeting or at any subsequent meeting." (Emphasis by the Court.)

There are other provisions in the Agreement which clearly disclose the nature and character of the written instrument as one providing for joint ratemaking between the two conferences.

(10) The Commission has the necessary procedures available to dissolve Agreement No. 8200 if it considers it no longer proper, and this course of action is much preferable to reaching an equivalent result by a faulty and erroneous interpretation of the agreement and a declaration that it never provided for joint rate action.

Our conclusion, therefore, is that the Commission erred in holding that Agreement No. 8200 did not permit joint ratemaking between PWC and FEC, but we agree with the Commission that the supplementary agreements are without sanction and require Section 15 approval; in all other respects the Commission's report and orders in Docket No. 872 are correct and should be affirmed.

Affirmed in part, reversed in part.