**Ralph NADER et al., Plaintiffs,**

**v.**

**AIR TRANSPORT ASSOCIATION OF AMERICA et al., Defendants.**

**Civ. A. No. 76–1180.**

United States District Court, District of Columbia.

Feb. 9, 1977.

---

**13.** See note 2 *supra.*

Reuben B. Robertson, III, John Cary Sims, Washington, D.C., for plaintiffs.

George W. Wise, David B. Lytle, Paul L. Joffe, Washington, D.C., for Air Transportation Assn. of America, Allegheny Airlines, Inc., American Airlines, Inc., Delta Airlines, Inc., Eastern Airlines, Inc., Frontier Airlines, Inc., Hawaiian Airlines, Inc., National Airlines, Inc., Ozark Airlines, Inc., Piedmont Aviation, Inc., and Trans World Airlines, Inc.

Samuel E. Gates, New York City, for KLM–Royal Dutch Airlines.

Arnold T. Aikens, Michael A. Katz, Chicago, Ill., Gerry Levenberg, Washington, D.C., for United AirLines, Inc.

Frank J. Costello, George R. Grange, Washington, D.C., for North Central Airlines, Inc.

1. Complaint ¶ 13.

2. *Id.* ¶ 14.

3. *Id.* ¶ 15.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

Plaintiffs bring this suit pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26 (1970), to enjoin as a violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1970), an alleged "contract, combination and conspiracy . . . in restraint of trade in interstate and foreign commerce."[1] The jurisdiction of this Court is invoked pursuant to 15 U.S.C. § 26 and 28 U.S.C. § 1337 (1970).

Plaintiffs allege that the defendants, the Air Transport Association of America—a trade association of certificated scheduled air carriers—and nineteen individual airline corporations, "have agreed not to compete either by ceasing to engage in overbooking, by modifying their reservation systems so as to significantly reduce the number of passengers denied boarding, by engaging in advertising relating to the practice of overbooking or the competitive risk of being denied boarding on competing airlines, or by warning persons making reservations that such reservations may not be honored because of overbooking."[2] In particular, plaintiffs contend that the defendants acted in furtherance of the alleged conspiracy by conducting a meeting on June 17, 1976, to discuss reservations policies and practices.[3]

This case is now before the Court on motions to dismiss filed by various defendants.[4] Defendants assert two grounds for dismissal: (1) plaintiffs have no standing to sue for injunctive relief under section 16 of the Clayton Act, 15 U.S.C. § 26, and (2) the doctrine of primary jurisdiction requires the court to dismiss this case to permit the Civil Aeronautics Board [CAB] to give initial consideration to the activities of which plaintiffs complain. For the reasons hereinafter stated, the Court concludes that plaintiff Ralph Nader has standing to sue

4. Defendant United Air Lines, Inc., filed a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). Since this motion raises the same issues as the other motions to dismiss, the Court will treat United's motion as one to dismiss.

under section 16 of the Clayton Act, but that the case should be dismissed pursuant to the doctrine of primary jurisdiction.

### I. *Plaintiff Ralph Nader's Allegations Of Direct Personal Injury From The Alleged Antitrust Violation Are Sufficient To Confer Standing Upon Him To Sue For Injunctive Relief Pursuant To Section 16 Of The Clayton Act.*

The first ground for dismissal asserted by defendants is that plaintiffs [5] lack standing to sue for injunctive relief under section 16 of the Clayton Act, 15 U.S.C. § 26. That section provides:

> Any person, firm, corporation or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity . . . .

Plaintiff Nader alleges that: (1) he "is and reasonably expects to be a frequent user of air transportation services in the United States and between the United States and Europe;" [6] (2) he "utilizes air transportation in travelling to scheduled meetings and on professional and personal business, and the unavailability of reliable airlines reservations or failure by an air carrier to honor a reservation imposes upon him significant expenses, loss of time, and inconvenience;" [7] and (3) the "conduct of the defendants threatens to cause loss and damage to [him] . . . by making it more difficult, or impossible, for [him] to obtain reservations which adequately assure that [he] will be able to obtain air transportation on specified flights, and by depriving [him] of the benefits of competition in airlines reservations practices." [8] Defendants contend that these allegations are insufficient to permit plaintiff Nader to sue under Section 16 of the Clayton Act because that section requires a plaintiff to demonstrate (1) a "particularized and personal injury beyond that of the public at large," [9] and (2) injury to a commercial interest.

Defendants' first argument is easily disposed of. Section 16 expressly states that injunctive relief to restrain antitrust violations is to be available "when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity". Thus, it is sufficient under section 16 for a plaintiff to allege an injury that would be cognizable in equity. While defendants are undoubtedly correct in asserting that section 16 (and general equity doctrine) requires that a plaintiff allege a particularized and personal injury *beyond* that of the public at large, *see* H. McLintock, Equity (2d ed. 1948); *cf. Pauling v. McElroy,* 107 U.S.App.D.C. 372, 278 F.2d 252, 254, *cert. denied,* 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960), they are incorrect in contending that plaintiff Nader has not done so. Plaintiff Nader does *not* seek merely to vindicate the "public interest" in protection of the national economy from the damages wrought by anti-competitive practices. Rather, as the above-quoted sections of the complaint demonstrate, plaintiff Nader has alleged concrete and particularized personal injuries arising from the alleged antitrust violation. [10] *Compare Int'l*

---

5. The second named plaintiff in this case is Public Citizen, Inc. It alleges that it is suing on behalf of its members, "many of whom are now and can reasonably be expected in the future to be users of air transportation services . . ." Complaint ¶ 4. Defendants argue that plaintiff Public Citizen, Inc., has no standing for the same reasons as plaintiff Nader. In addition, they assert that Public Citizen, Inc., has no standing to sue on behalf of its members. Since this suit is for injunctive relief, and because this Court finds that plaintiff Nader has standing under section 16, it is unnecessary to

address defendants' separate analysis of Public Citizen's standing to sue on behalf of its members.

6. Complaint ¶ 3.

7. *Id.* ¶ 12.

8. *Id.* ¶ 17.

9. Defendants' Memorandum of July 26, 1976, at 8.

10. Defendants' constitutional standing argument under *Eastern Kentucky Welfare Rights Organization v. Simon,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), is similarly unper-

*Tel. & Tel. Corp. v. General Tel. & Electronics Corp.,* 369 F.Supp. 316 (M.D.N.C.1973); *Burkhead v. Phillips Petroleum Co.,* 308 F.Supp. 120 (N.D.Cal.1970). He has therefore stated a claim cognizable both in equity and under section 16.

Since plaintiff Nader alleges sufficient personal injury to state a claim cognizable in equity, it is necessary to consider defendants' second argument—that only injury to a commercial interest will confer standing under section 16. Defendants contend that despite the broad language of section 16, Congress intended the courts to grant injunctive relief to private plaintiffs only under the same conditions under which treble damages can be recovered pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15 (1970). Since section 4 expressly provides that treble damages can be recovered only when a person is "injured in his business or property by reason of anything forbidden in the antitrust laws," and particularly because at least some courts that have considered the issue have also required plaintiffs to be within the "target area" of an alleged conspiracy, *see, e.g., Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292, 1295 (2d Cir. 1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972), defendants' argument, in effect, is that no consumer, even one who suffers serious injuries from an antitrust violation, has standing to seek injunctive relief pursuant to section 16.

Surprisingly few courts have considered the scope of standing under section 16, and those that have are divided. *Compare In re Multidistrict Vehicle Air Pollution,* 481 F.2d 122, 130 (9th Cir.), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973), *and Tugboat, Inc. v. Mobile Towing Co.,* 534 F.2d 1172, 1174 (5th Cir. 1976), *with Nassau County Association of Insurance Agents, Inc. v. Aetna Life & Casualty Co.,* 497 F.2d 1151, 1154 n.2 (2d Cir.), *cert. denied,* 419 U.S. 968, 95 S.Ct. 232, 42 L.Ed.2d 184 (1974). Moreover, none of the courts that have considered the issue have clearly articulated

the basis for their decisions. Perhaps the most comprehensive analysis of the issue appears in a recent law review article that reviewed the legislative history of the Clayton Act and concluded that "[t]he committee hearings, reports, and debates on the 1914 legislation make it clear that sections 4 and 16 were intended to deal with the identical type of injury . . . and that the difference in language was merely fortuitous." Malina, *The Second Circuit Review, 1973–74 Term: Antitrust,* 41 Brooklyn L. Rev. 889 (1975). Unfortunately, that article focused exclusively on the legislative history and gave no consideration to the policy difference between the two statutory remedies.

The Court has studied the relevant portions of the legislative history analyzed by the Malina article and by the parties in this case. The Court concludes that the legislative history offers no such easy answer as Mr. Malina suggests. Rather, the legislative history is replete with ambiguity. *Cf. Hawaii v. Standard Oil Co. of California,* 405 U.S. 251, 261, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). The Malina article suggests that the specific references in section 16's legislative history to loss or damage to "business or property" demonstrate that Congress intended to limit the scope of section 16. However, such references were just as likely intended only to be examples of situations in which injunctive relief would be available under section 16. Particularly in view of the broad language of section 16, it is necessary to consider " 'the necessities of the public interest which Congress sought to protect.' " *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 131, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969), *quoting Hecht Co. v. Bowles,* 321 U.S. 321, 330, 64 S.Ct. 587, 88 L.Ed. 754 (1944).

The Supreme Court has given a broad interpretation of the purposes of the private enforcement provisions of the antitrust laws. In *Zenith,* the Court concluded that "the purpose of giving private parties

---

suasive, for the particular injuries of which plaintiff Nader complains are "likely to be re-

dressed by a favorable decision." *Id.* at 38, 96 S.Ct. at 1924.

treble-damage and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws." 395 U.S. at 130–31, 89 S.Ct. at 1580. Writing for the Court, Justice White emphasized that section 16 "should be construed and applied with this purpose in mind". *Id.* at 131, 89 S.Ct. at 1580. An expansive reading of section 16 will undoubtedly permit more comprehensive policing of the antiturst laws and thereby effectuate congressional intent to "vindicate the important public interest in free competition." *Fortner Enterprises, Inc. v. U. S. Steel Corp.,* 394 U.S. 495, 502, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969). In light of these policy considerations, and since section 16 will not expose antitrust violators to "potentially disastrous judgments for treble damages . . . [and] the potential threat of duplicative recoveries," *In re Multidistrict Vehicle Air Pollution,* 481 F.2d at 130, an expansive reading of section 16 is to be preferred.

■ This conclusion is further buttressed by the legislative history of the recent Hart-Scott-Rodino Antitrust Improvements Act of 1976. P.L. 94–435, 90 Stat. 1383. The House Report manifests an unequivocal congressional determination to encourage private enforcement of the antitrust laws:

> The antitrust laws clearly reflect the national policy of encouraging private parties [including consumers] to help enforce the antitrust laws in order to protect competition through compensation of antitrust victims, through punishment of antitrust violators, and through deterrence of antitrust violations. Litigation by "private attorneys general" for monetary relief and for injunctive relief has frequently proved to be an effective enforcement tool. . . . Section 3(3) of H.R. 8532, therefore, is intended to reiterate congressional encouragement for private parties to bring and maintain meritorious antitrust injunction cases. Under this section, a plaintiff who substantially prevails would be entitled to the award of "reasonable attorneys' fees."

H.Rep. No. 94–499, 94th Cong., lst Sess. 19–20 (1975) U.S.Code Cong. & Admin. News 1976, pp. 2572, 2589. This reaffirmation of the fundamental concept of private antitrust enforcement strongly reinforces this Court's conclusion that section 16 was intended to confer standing on consumers, such as Mr. Nader, who assert sufficient personal injury from antitrust violations to state a claim cognizable in equity. Accordingly, the Court must reject defendants' first ground for dismissal.

II. *The Doctrine Of Primary Jurisdiction Requires The Court To Dismiss This Case Pending Initial Consideration Of The Alleged Agreement By The Civil Aeronautics Board.*

The second ground that defendants have asserted in support of their motions to dismiss is the doctrine of primary jurisdiction. A succinct introduction to this doctrine and its application to the air transportation industry is found in the Third Circuit's opinion in *Laveson v. Trans World Airlines,* 471 F.2d 76 (3d Cir. 1972):

> The doctrine of primary jurisdiction was formulated in the last several decades as a judicial response to the creation of wide-ranging federal administrative agencies. It may be viewed as an effort to resolve procedural and substantive conflicts inevitably created when there is hewed out for an agency an area of original jurisdiction impinging on the jurisdiction of the courts.

*Id.* at 77. *See generally* L. Jaffe, Judicial Control of Administrative Action, 141–51 (Abridged ed. 1965).

> [The doctrine] holds that in some cases, courts should not render a decision—exercise their jurisdiction—until certain issues have been passed upon by the appropriate administrative agency. In the specific context of cases within the jurisdiction of the CAB, for example, the doctrine is fashioned to insure that the antitrust exemption provided by Congress in the Federal Aviation Act not be undermined through a bypassing of the CAB, the

agency created to regulate the air transportation industry.

471 F.2d at 79–80.

The statutory framework relevant to the primary jurisdiction issue in this case is as follows: Under section 412 of the Federal Aviation Act of 1958 [hereinafter, "the Act"], 49 U.S.C. § 1382 (1970), the CAB has the authority to approve a "contract or agreement" such as that alleged here if it determines that such contract or agreement is not "adverse to the public interest" and not "in violation of this chapter."[11] Any parties to a contract or agreement so approved by the CAB are, by operation of section 414 of the Act, 49 U.S.C. § 1384 (1970), "relieved from the operations of the 'antitrust laws.'" *See Pan American World Airways, Inc. v. United States*, 371 U.S. 296, 304, 83 S.Ct. 476, 482, 9 L.Ed.2d 325 (1963). Thus, if the CAB were to approve the alleged "contract, combination and conspiracy" pursuant to section 412, no court could either award damages or grant injunctive relief against any parties to the approved agreement.[12]

The problem presented by this case is that the parties to the agreement here in issue (the existence of which is in dispute) have not sought approval from the CAB. Thus, the CAB has to date neither approved nor disapproved, nor even considered, the alleged agreement. This situation is, however, not unprecedented. In both *United States Navigation Co. v. Cunard S. S. Co.*, 284 U.S. 474, 58 S.Ct. 247, 76 L.Ed. 408 (1932), and *Far East Conference v. United States*, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952), the Supreme Court considered whether a district court should address the merits of a suit seeking to enjoin rate agreements among shippers that allegedly violated the Sherman Act *before* the agreements had been submitted for approval to the Federal Maritime Board [FMB]. Under section 15 of the Shipping Act of 1916, 46 U.S.C. § 814 (1970), "common carriers by water" were required to file with the FMB every "agreement," and the FMB was required to approve or disapprove all such agreements. Both the *Cunard* and *Far East* courts held that the doctrine of primary jurisdiction precluded a district court from granting injunctive relief against alleged antitrust violations until the FMB had initially considered whether to approve the agreement: Whether or not the agreement had been filed with the FMB for consideration was deemed irrelevant. 284 U.S. at 486, 58 S.Ct. 247; 342 U.S. at 493 n.4, 72 S.Ct. 492.

Both the holding and rationale of these Shipping Act cases are equally applicable to situations, such as in the case at bar, which implicate the "immunizing" authority of the CAB pursuant to section 412 of the Federal Aviation Act. *See generally* King, *The "Arguably Lawful" Test of Primary Jurisdiction in Antitrust Litigation Involving Regulated Industries*, 40 Tenn.L.Rev. 617, 638–48, 657–58 (1973). The Court of Appeals of this circuit so held over 25 years ago in *S. S. W., Inc. v. Air Transport Association of America*, 89 U.S.App.D.C. 73, 191 F.2d 658 (1951), *cert. denied*, 343 U.S. 955, 72 S.Ct. 1049, 96 L.Ed. 1355 (1952), when it concluded that no injunctive relief is available in the district court until the CAB has had an opportunity to act on matters that it could immunize under section 412. This authority remains undiminished today.[13]

---

11. Conversely, the CAB must disapprove any contract or agreement it determines to be "adverse to the public interest, or in violation of this chapter." 49 U.S.C. § 1382(b).

12. The Board's § 412 power to "immunize" agreements from the operation (and sanctions) of the antitrust laws and its power to grant plaintiffs the very relief they seek from this Court, *see* note 15 *infra*, renders this case entirely distinguishable from many primary jurisdiction cases, such as *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 96 S.Ct. 1978, 48

L.Ed.2d 643 (1976), in which the agency has no power either to release the defendant from liability or to award plaintiff the relief he seeks. *See, e.g., Aloha Airlines, Inc. v. Hawaiian Airlines, Inc.*, 489 F.2d 203 (9th Cir. 1973), *cert. denied*, 417 U.S. 913, 94 S.Ct. 2612, 41 L.Ed.2d 217 (1974); *International Travel Arrangers v. Western Air Lines, Inc.*, 408 F. Supp. 431 (D.Minn.1975).

13. In fact, if anything, the CAB has more extensive authority than the FMB to immunize agreements retrospectively, *see Mark Aero,*

Plaintiffs attempt to evade the impact of the *Cunard-Far East* general rule against all injunctive relief pending initial agency consideration by pointing to yet another, more recent, Shipping Act case, *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1963). In *Carnation*, the Court held that plaintiffs could recover treble damages arising out of the "past and completed" implementation of rate agreements that were not submitted to and therefore not approved by the Federal Maritime Commission [the successor to the FMB]. In distinguishing *Cunard* and *Far East*, the *Carnation* court emphasized that the overriding consideration in the earlier cases was to require courts to "refrain from taking action which might interfere with the Commission's exercise of its lawful powers." 383 U.S. at 221, 86 S.Ct. at 786. Thus, the Court said:

> Even if the Commission [had] found that the defendants in those cases had implemented unapproved agreements, the Commission might decide to approve the prospective implementation of those agreements. The Commission would obviously be hampered in the exercise of that power if a court had previously issued an unconditional injunction prohibiting the implementation of the agreements in question. Therefore, the Court [in *Cunard* and *Far East*] concluded that the District Court should not be permitted to issue an unconditional injunction in the absence of a Commission determination disapproving future operations under those agreements.

*Id.*

Plaintiffs focus on the *Carnation* Court's choice of the phrase "unconditional injunction." They argue that in choosing this language, the Court intended to leave the door open for district courts to issue "conditional" injunctions in cases such as the present one. They buttress this interpretation of *Carnation* with citation to *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). The district court there had found that the defendant power company "had attempted to monopolize and had monopolized the retail distribution of electric power in its service area in violation of § 2 of the Sherman Act," 410 U.S. at 368, 93 S.Ct. at 1025, and the court enjoined the defendant from engaging in certain anti-competitive and monopolistic practices. In response to defendant's argument that the Federal Power Act insulated it from such antitrust regulation, the Supreme Court said:

> [T]he decree of the District Court, as far as the present record is concerned, presents no actual conflict between the federal judicial decree and an order of the Federal Power Commission. The argument concerning the preemption of the area by the Federal Power Commission concerns only instances which may arise in the future . . . . The decree of the District Court has an open end by which that court retains jurisdiction "necessary or appropriate" to carry out the decree or "for the modification of any of the provisions." . . . It will be time enough to consider whether the antitrust remedy may override the power of the Commission under § 202(b). . . . At present, there is only a potential conflict, not a present concrete case or controversy concerning it.

410 U.S. at 376–77, 93 S.Ct. at 1029. Plaintiffs contend that this language, when read in conjunction with *Carnation,* indicates that the Court has *sub silentio* limited the broad scope of the *Cunard-Far East* rule by permitting district courts to grant injunctive relief so long as the injunction (1) creates no *present* conflict with agency action, and (2) is conditional, or "open-ended," so that the district court can later modify its decree if necessary to avoid conflict with agency action.

■ This Court has given careful consideration to plaintiffs' argument, for this issue appears to be one of first impression. For a number of reasons, however, the Court concludes that at least insofar as the

*Inc. v. Trans World Airlines*, 411 F.Supp. 610, 615 n.3 (W.D.Mo.1976), and such broader authority would warrant more, not less, judicial deference to an agency's primary jurisdiction.

CAB's immunizing power under section 412 is concerned, *Carnation* and *Otter Tail* do *not* alter the well-established *Cunard-Far East* primary jurisdiction rule.

█ Plaintiffs' argument would be very persuasive if the only purpose of the doctrine of primary jurisdiction were to avoid court-agency conflict. It is clear, however, that the doctrine serves other important purposes as well. *See Kappelman v. Delta Air Lines, Inc.,* 176 U.S.App.D.C. 163, 539 F.2d 165, 169 (1976); Botein, *Primary Jurisdiction: The Need for Better Court/Agency Interaction,* 29 Rutgers L.Rev. 867, 878–84 (1976). One of the most significant purposes of the doctrine is to encourage "uniform" regulation of industries that Congress has subjected to a pervasive regulatory scheme, particularly when the substance of an alleged antitrust violation, here reservations practices, is "basic in the regulatory scheme" and a "precise ingredients of the Board's authority". *Pan American World Airways, Inc. v. United States, supra,* 371 U.S. at 305, 83 S.Ct. at 482.[14] As the Ninth Circuit described this purpose of primary jurisdiction:

> [W]hen a regulatory agency has pervasive authority and the ability and expertise to exercise coordinated control over an entire industry and over all facets of that industry's behavior, the agency having this overview of the entire industry is in the better position to resolve wholly intra-industry problems, and, being more attuned to the problems of the whole industry, better able to formulate and implement remedies which are flexible and deal with *all* of the intra-industry ramifications. . . . In essence, it reflects a congressional determination that continuing regulation is a better calibrated tool for dealing with and controlling anti-competitive behavior within an industry than the more blunt and generalized instrument of the antitrust laws.

. . . In light of these factors, the District Court is to refrain from immediate or hasty interference in intra-industry problems of industries subject to the control of a regulatory agency, until the regulatory agency has had an opportunity to carry out the functions for which it was initially created by Congress.

*Foremost International Tours, Inc. v. Qantas Airways Ltd.,* 525 F.2d 281, 284–85 (9th Cir. 1975).

There can be no doubt that the *Cunard-Far East* rule was intended to promote such "[u]niformity and consistency in the regulation of business entrusted to a particular agency". 342 U.S. at 574, 72 S.Ct. at 494. It is therefore necessary for this Court to ascertain whether the Supreme Court intended in *Otter Tail* and *Carnation* to deemphasize the importance that courts should attribute to the promotion of "uniform" regulation. Certainly nothing in either *Otter Tail* or *Carnation* expressly indicates such a modification of the primary jurisdiction doctrine. While admittedly the *Otter Tail* Court focused exclusively on the avoidance of court-agency conflict, it recognized that Congress had not intended the Federal Power Act to create a "pervasive regulatory scheme for controlling the interstate distribution of power". 410 U.S. at 374, 93 S.Ct. at 1028. Thus, Congress did not intend the Federal Power Commission to regulate the power industry in the same comprehensive manner that it intended the CAB to regulate air carriers. Accordingly, *Otter Tail* cannot be read to suggest that district courts should not weigh heavily the importance of regulatory uniformity in determining whether the doctrine of primary jurisdiction is appropriately applied to the "pervasively regulated" air transportation industry.

█ *Carnation* also suggests no such modification of the doctrine of primary jur-

---

**14.** The CAB has a long history of concern with the specific reservations practice—overbooking—that is the focus of the alleged agreement. This CAB involvement in the overbooking issue was detailed by the D.C. Circuit in *Nader v. Allegheny Airlines, Inc.,* 512 F.2d 527, 533–37 (1975). The CAB currently has in force regulations regarding overbooking practices, 14 C.F.R. §§ 250.3 *et seq.,* and the Board is presently re-examining its whole approach to this issue. 41 Fed.Reg. 16,478 (1976).

isdiction. As indicated above, that case held that the award of treble damages for a past antitrust violation should not be deferred pending initial agency consideration. In so holding, the Court omitted any discussion of the impact of such an award on regulatory uniformity despite the fact that the shipping industry was "pervasively regulated." However, *Carnation* must be distinguished from the present case, since there the Federal Maritime Commission had no power to grant plaintiffs the relief—damages—that they sought. In contrast, in the present case, as in *Cunard* and *Far East*, the agency has the authority to afford plaintiffs all the relief—in the nature of a restraining order—that they seek from the Court.[15] Where the agency is empowered to grant such relief, considerations of regulatory uniformity are particularly appropriate. Moreover, as the Court of Appeals for this circuit stated in *S. S. W., Inc. v. Air Transport Association of America, supra,* the principles of *both* exhaustion of administrative remedies and primary jurisdiction are promoted by requiring plaintiffs in such a case to pursue their complaint in the first instance at the administrative level. 191 F.2d at 662.[16] Therefore, in the absence of express language, this Court will not infer from *Carnation* that the doctrine of primary jurisdiction should not be invoked by a court for the purpose of promoting regulatory uniformity.[17]

### III. *Conclusion*

■ The Court therefore concludes that the *Cunard-Far East* primary jurisdiction rule precludes this Court from granting *any* injunctive relief against the alleged antitrust violation until the CAB has had an opportunity to consider whether to approve the alleged agreement. In the circumstances of this case, where the industry was intended by Congress to be subject to "pervasive regulation" by the CAB, where the subject matter of the alleged agreement is "basic to [that] regulatory scheme," where the CAB has the statutory authority to immunize the alleged agreement from the operation of the antitrust laws, and where the CAB has the power to grant plaintiffs the very relief they seek from this Court, regulatory uniformity would be substantially promoted by this Court refusing to consider the merits of plaintiff's claim pending initial CAB consideration of the alleged agreement. Accordingly, "[b]usiness-like procedure counsels that the . . . complaint should now be dismissed". *Far East, supra,* 342 U.S. at 577, 72 S.Ct. at 496.

**15.** The Act authorizes the CAB to investigate any complaint "with respect to anything done or omitted to be done by any person in contravention of any provisions of this chapter, or of any requirement established pursuant thereto," 49 U.S.C. § 1482(a), and to issue an "appropriate order" to compel compliance therewith. 49 U.S.C. § 1482(c). *See S. S. W., Inc. v. Air Transport Association of America, supra,* 191 F.2d at 662; *Laveson v. Trans World Airlines, supra,* 471 F.2d at 79 n.17. In fact, it appears that the CAB is presently conducting at least an informal investigation of the alleged agreement. *See* C.A.B. Order 76–9–76 (Sept. 14, 1976).

The CAB also has express authority to issue cease-and-desist orders to restrain "unfair or deceptive practices or unfair methods of competition in air transportation or the sale thereof." 49 U.S.C. § 1381.

**16.** The Third Circuit's decision in *Laveson v. Trans World Airlines, supra,* strongly supports this conclusion. Plaintiffs there sought to recover treble damages for the alleged implementation of an unapproved agreement establishing a $2.00 fee for rental of headsets used with inflight motion pictures. The question arose as to whether the CAB would have the authority to immunize retroactively an unapproved agreement from antitrust liability. Although this issue was solely one of statutory construction, and thus was appropriate for judicial determination, the court refused even to consider the issue until the CAB had given it initial consideration. *Accord, Price v. Trans World Airlines, Inc.,* 481 F.2d 844 (9th Cir. 1973).

**17.** It should be noted that nothing in *Nader v. Allegheny Airlines, Inc., supra* note 12, suggests a contrary conclusion. In fact, the Supreme Court affirmed that in certain cases primary jurisdiction should be invoked to encourage "[u]niformity and consistency in the regulation of business entrusted to a particular agency". 426 U.S. at 303–04, 96 S.Ct. at 1987, quoting *Far East Conference v. United States.* The *Nader* court merely concluded that in the circumstances of that case, considerations of uniformity in regulation did not warrant application of the doctrine of primary jurisdiction.

After the CAB has acted on this matter, plaintiffs can easily institute a similar suit if such resort to the courts is considered appropriate at that time.

An Order in accordance with the foregoing will be issued of even date herewith.